ALLSTATE INSURANCE COMPANY,
Plaintiff, Appellant,

v.

Michael SABBAGH, Defendant, Appellee.

No. 79-1197.

United States Court of Appeals,
First Circuit.

Argued June 8, 1979.

Decided Aug. 1, 1979.

Duane C. Quaini, Chicago, Ill., with whom John G. Ryan, DiMento & Sullivan, Boston, Mass., William T. Barker, Robert H. King, Jr., and Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., were on brief, for plaintiff, appellant.

Kathleen King Parker, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., on brief, for defendant, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

The only issue presented on appeal is whether the district court acted within its discretion in dismissing this action, which challenges Massachusetts automobile insurance rates, on the basis of the abstention doctrine that has grown out of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Alabama Public Service Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). We hold that it did.

Under applicable Massachusetts law insurance companies normally may set their own automobile insurance rates, but they must submit those rates to the Massachusetts Commissioner of Insurance for review. Mass.Gen.Laws Ann. (M.G.L.) ch. 175E, § 7. The Commissioner is empowered to hold a hearing to determine whether competition is sufficient to assure that rates will not be excessive. M.G.L. ch. 175E, § 5. If he finds competition insufficient, he must then set rates for the industry pursuant to M.G.L. ch. 175, § 113B, which requires that such rates be "adequate, just, reasonable and nondiscriminatory".[1] The Commissioner's decisions are subject to the following review procedure:

"Any person or company aggrieved by any action, order, finding or decision of the commissioner under this section, may, within twenty days from the filing of such memorandum thereof in his office, file a petition in the supreme judicial court for the county of Suffolk for a review of such action, order, finding or decision. An order of notice returnable not later than seven days from the filing of such petition shall forthwith issue and be served upon the commissioner. Within ten days after the return of said order of notice, the petition shall be assigned for a speedy and summary hearing on the merits. The action, order, finding or decision of the commissioner shall remain in full force and effect pending the final decision of the court unless the court or a justice thereof after notice to the commissioner shall by a special order otherwise direct. The court shall have jurisdiction in equity to modify, amend, annul, reverse or affirm such action, order, finding or decision, shall review all questions of fact and of law involved therein and may make any appropriate order or decree. The decision of the court shall be final and conclusive on the parties. The court may make such order as to costs as it deems equitable. The court shall make such rules or orders as it deems proper governing proceedings under this section to secure prompt and speedy hearings and to expedite final decisions thereon."

In June of 1978 the Commissioner determined that he would have to set rates for the calendar year 1979. He held hearings

---

1. Under § 113B any company may apply to the Commissioner for permission to use a rate lower than that set.

in September of 1978 at which the insurance industry was represented, and he announced the 1979 rates on November 22, 1978. The rates are set on the basis of a series of projections applied to industry data for 1977, the most recent year for which data was available. Allstate, using projections based on data developed during the first ten months of 1978, estimates that it will suffer an underwriting loss of $5,000,000 during 1979 if the Commissioner's rates are in effect. Allstate elected to bypass the statutory review proceeding outlined above and commenced this action for declaratory and injunctive relief against the Commissioner in federal court alleging that the state's rates are confiscatory in violation of the federal and Massachusetts Constitutions. Federal jurisdiction is grounded both on the existence of federal questions, including a federal civil rights claim, and on diversity of citizenship. 28 U.S.C. §§ 1331(a), 1332(a)(1), 1343(3), and 1343(4).

■ Courts and scholars have struggled to define and explain the abstention doctrine which permits federal courts to avoid deciding cases over which they have jurisdiction.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.' " *Col-*

*orado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163, 47 L.Ed.2d 483 (1959).

On the other hand,

"Although a federal equity court does have jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise, 'refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest'; for it 'is in the public interest that the federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.' " *Burford v. Sun Oil Co.,* 319 U.S. 315, 317–18, 63 S.Ct. 1098, 1099, 87 L.Ed. 1424 (1943) (footnotes omitted), *quoting United States v. Dern,* 289 U.S. 352, 360, 53 S.Ct. 614, 77 L.Ed. 1250 (1933) and *Pennsylvania v. Williams,* 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841 (1935); *Puerto Rico International Airlines, Inc. v. Silva Recio,* 520 F.2d 1342, 1345 (1st Cir. 1975).

These conflicting signals, together with the searching review and willingness to reverse demonstrated by the Supreme Court in abstention cases, suggest to us that the district court's discretion is tightly circumscribed, but that there remains some room for the exercise of judgment. The Supreme Court's opinions in the leading cases, *Burford* and *Alabama Public Service,* give the guidelines for our analysis.[2]

---

2. In *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), Justice Brennan, writing for the Court, classified *Burford* and *Alabama Public Service* in a subcategory of the doctrine permitting abstention "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25,

79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) . . .", 424 U.S. at 814, 96 S.Ct. at 1244. This suggests that there must be a difficult question of state law in a *Burford* abstention case. *See also Zablocki v. Redhail,* 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *But see Construction Aggregates Corp. v. Rivera de Vicenty,* 573 F.2d 86, 89 (1st Cir. 1978); 1A Moore's Federal Practice, ¶ 0.203[2] (1978), p. 2124.

While one can plausibly argue that the state law question is no different from the federal

The *Burford* case involved a suit to enjoin execution of an order of the Railroad Commission of Texas permitting the drilling of several oil wells. The district court dismissed the complaint, the circuit court reversed, and the Supreme Court decided that the district court had been correct. The Railroad Commission was charged with the difficult task of balancing the need for and conservation of oil from the East Texas oil pool with the rights of the separate owners of the surface land to their shares of the oil in the pool. The Court noted that the field had to be regulated as a unit in order to serve these interests and that the federal government had left the principal regulatory authority with the state. 319 U.S. at 319, 63 S.Ct. 1098. Indeed, there had been a history of federal court intervention that had disrupted the regulatory program.

The Court dwelt on the important role in the regulatory program assigned by the Texas legislature to the state courts:

"[T]he Texas courts are working partners with the Railroad Commission in the business of creating a regulatory system for the oil industry. The Commission is charged with the principal responsibility for fact finding and for policy making and the courts expressly disclaim the administrative responsibility, but on the other hand, the orders of the Commission are tested for 'reasonableness' by trial de novo before the court, and the court may on occasion make careful analysis of all the facts of the case in reversing a Commission order. The court has fully as much power as the Commission to determine particular cases, since after trial de novo it can either restrain the leaseholder from proceeding to drill, or, if the case is appropriate, can restrain the Commission from interfering with the leaseholder. The Court may even formulate new standards for the Commission's administrative practice and suggest that the Commission adopt them." 319 U.S. at 326, 63 S.Ct. at 1103. (citations omitted).

In order to avoid confusion, review of the Commission orders was concentrated in a particular state court. Concentration also allowed the state court to develop a particular expertise to aid it in shaping regulatory policy.

The Court concluded:

"The State provides a unified method for the formation of state policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved. *Cf. Matthews v. Rodgers*, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand." 319 U.S. at 334, 63 S.Ct. at 1107.

*Alabama Public Service* presented a claim somewhat closer to the one before us. The Commission, with authority over intrastate railroad passenger service, refused to allow the company to terminate two routes on

issue, i. e., whether the 1979 rates are confiscatory or not, we view the charter of the state court under § 113B as a broad one, the effective carrying out of which in any one case may well pose difficult questions of state law. Moreover, we see no reason or policy which would exclude as a "difficult question of state law" a question, requiring the most sophisticated analysis of complex facts, whether a rate meets a legal standard. Such a query may not be a "question of law" in the purest sense, but neither is it a mere "question of fact". And we cannot see why doctrine should encourage a federal court to undertake resolution of such difficult "mixed questions of law and fact", and discourage it from essaying a difficult task of purely legal analysis.

In any event, *Colorado River* did not purport to overrule or undermine the earlier cases in any way, and we think that federal intervention here "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern", *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1245, in much the same way as the earlier cases despite the absence of an a priori, clearly distinguishable, difficult issue, which is one of purely state law.

which the company claimed it was losing money. The company alleged that the Commission's action was confiscatory and sought to enjoin the Commission from enforcing it. A federal three-judge court heard evidence and held the Commission action void and unenforceable. The Supreme Court ruled that the district court should have abstained. The Court referred to the case as involving "the essentially local problem of balancing the loss to the railroad from continued operation of [the two trains] with the public need for that service" in the affected communities. 341 U.S. at 347–48, 71 S.Ct. at 767. Alabama, like Texas, had provided for appeal from orders of the Commission in a particular court which "after a hearing on the record certified by the Commission, is empowered to set aside any Commission order found to be contrary to the substantial weight of the evidence or erroneous as a matter of law, and its decision may be appealed to the Alabama Supreme Court. Statutory appeal from an order of the Commission is an integral part of the regulatory process under the Alabama Code. Appeals, concentrated in one circuit court, are 'supervisory in character.' The Supreme Court of Alabama has held that it will review an order of the Commission as if appealed directly to it, and that judicial review calls for an independent judgment as to both law and facts when a denial of due process is asserted." 341 U.S. at 348, 71 S.Ct. at 767–768 (citations omitted). As in *Burford*, the availability of an adequate state review "based upon predominantly local factors" convinced the Supreme Court that "the usual rule of comity" required the company to pursue its rights in the state court system. *Id.* at 348–49, 71 S.Ct. 762.

We recognize, this being a close case, that substantial arguments can be made that our case differs from these cases in certain very important respects. Facially there is force in the contention that federal court resolution of this controversy does not present the same kind of threat to the coherency of the state scheme. In both *Burford* and *Alabama Public Service* the federal court was being asked to pass on a state commission's exercise of discretion with respect to a few particular applications of a regulatory scheme that could not succeed unless it could be consistently applied. Thus had those cases gone the other way, the federal courts would have been added as an independent authority making the same decisions as the state regulators. Here, the entire rate schedule for 1979 is being attacked as unconstitutional.[3] If appellant prevailed, the appellant urges, the state would have to start from scratch; if appellant lost, the state's scheme could go forward without interruption.[4] "[T]here is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy." *Zablocki v. Redhail*, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n.5, 54 L.Ed.2d 618 (1978); *Construction Aggregates Corp. v. Rivera de Vicenty*, 573 F.2d 86, 92 (1st Cir. 1978). The state has no right to an unconstitutional policy, coherent or otherwise. "Once [constitutionality] is known, state policy can be as coherent as it wishes to be." *Kartell v. Blue Shield of Massachusetts, Inc.*, 592 F.2d 1191, 1196 (1st Cir. 1979) (Coffin, C. J., dubitante).

3. As the Supreme Court has noted, "the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 815 n. 21, 96 S.Ct. 1236, 1245 n.21, 47 L.Ed.2d 483 (1976). In the context of this case, where the federal question is resolved only after a mass of data is analyzed by methods and on principles that owe nothing more to national than to state government, we see significance in the Court's use of "may".

4. Though this case does not, another case might present the same kind of threat to the coherency of the state program. For instance, a company might come to federal court seeking review of a decision by the Commissioner to refuse permission to use a rate different from that set by the Commissioner for the industry. *See* M.G.L. ch. 175, § 113B, and note 1, *supra*. When the companies are free to set their own rates, the Commissioner's decisions on review of those rates, M.G.L. ch. 175E, § 7, are subject to review only in the SJC. M.G.L. ch. 175E, § 13. Thus, the state does have legitimate interest in establishing a single court to review consistently questions arising in this area.

Secondarily, it is argued that this case does not present an issue of state law different from the federal issue. If we confine our view of the issue to that presented by the complaint rather than that imposed by statute on the state court, the only state issue presented is a confiscation issue arising under a similar provision of the Massachusetts constitution. Although the state court could dispose of a case such as this under the more demanding statutory requirement that the rates be "adequate, just, reasonable and nondiscriminatory", M.G.L. ch. 175, § 113B; see *Massachusetts Bonding and Ins. Co. v. Commissioner of Insurance*, 329 Mass. 265, 107 N.E.2d 807 (1952), appellant is not seeking more than the minimum constitutional review. Apparently the constitutional question, substantively, is no different under the state or federal constitution.[5]

▮ We think, however, that the similarities between our case and the *Burford* and *Alabama Public Service* cases justifies our overlooking the distinctions. As in those situations, we are dealing with an area of intensely local interest, and the state has indicated the importance it places on coherency of its policy by concentrating review of all regulatory decisions in one court. See *Construction Aggregates, supra*, 573 F.2d at 96 (upholding abstention as to a challenge to insurance rates). Indeed, Massachusetts has given exclusive jurisdiction to its Supreme Judicial Court without intermediate lower court review and has set time limits assuring expedition. Moreover, the state court's role in the regulatory scheme is far more significant than, for instance, our normal role in the federal agency process, and certainly more significant than our role in this case would be. "The court shall have jurisdiction in equity to modify, amend, annul, reverse or affirm such action, order, finding or decision, shall review all questions of fact and of law involved therein and may make any appropriate order or decree." M.G.L. ch. 175, § 113B. The review is not limited to consti-

tutional questions. *Massachusetts Bonding and Ins. Co., supra*. The court's review of nonconstitutional claims "embraces questions of law, and, on the factual side, a reexamination of the proceedings already concluded before the commissioner in order to determine whether his findings had reasonable support in the evidence." *Id.* at 273, 107 N.E.2d at 812. Where a confiscation claim is made the SJC has said "we have a duty to make an independent determination of the facts, and we may enter orders to protect the plaintiff's constitutional rights." *Boston Gas Co. v. Dep't of Public Utilities*, 368 Mass. 51, 329 N.E.2d 712, 715 (1975). In practice, the SJC has taken this duty seriously and has on occasion overturned orders of the Commissioner for statutory or constitutional error. See, e. g., *Massachusetts Rating and Accident Prevention Bureau v. Commissioner of Insurance*, 362 Mass. 43, 283 N.E.2d 862 (1973); *Aetna Casualty and Surety Co. v. Commissioner of Insurance*, 358 Mass. 272, 263 N.E.2d 698 (1970).

In short, the statutory appeal "is an integral part of the regulatory process". *Alabama Public Service*, 341 U.S. at 348, 71 S.Ct. at 767. The SJC has special powers which we do not possess to enable it to correct any problems in orders of the Commissioner without going to the extreme of forcing the whole process to begin anew. Moreover, the state's regulatory scheme contemplates review in a court that will necessarily "acquire a specialized knowledge which is useful in shaping the policy of regulation in the ever-changing demands in this field." *Burford*, 319 U.S. at 327, 63 S.Ct. at 1104. Thus in a very real sense federal court intervention would disrupt the regulatory scheme and the issue in the state court would be different because the state court could respond to the problem differently. This case would inevitably involve detailed factual analysis of the bases of the Commissioner's decision and Allstate's efforts to prove the Commissioner's decision unjustified. The SJC, with its special powers and expertise, could protect appellant's

---

5. It would nevertheless be anomalous to allow a plaintiff to avoid abstention simply by limiting its pleading to a constitutional issue where,

as here, that issue involves the same kind of complex mixed question of fact and law as does the statutory issue.

federal rights as well as, if not better than, a federal court could. *See* Field, *Abstention in Constitutional Cases,* 122 U.Pa.L. Rev. 1071, 1156–57 (1974). Moreover, the state's scheme contemplates that the Commissioner's orders will ordinarily go into effect pending an expedited and summary court review. Were it to be held that it is proper for a federal court to hear this kind of challenge, then even if its particular decision was to uphold the 1979 rates, the result in the long run would be the interruption and delay in effectuating rate orders occasioned by the ready access to a decider not in any way bound by the dictates of § 113B.

■ We admit to some concern about allowing the abstention doctrine to be used to defeat the substantive rights of the plaintiff in contesting the 1979 rates. That may well be the result in this case given the short 20 day deadline for filing for review of the Commissioner's decision in the SJC. M.G.L. ch. 175, § 113B. The responsibility, however, must lie with appellant which made the tactical decision to try to pursue its action in federal court rather than take the case directly to the SJC where it could be assured of a speedy adjudication of its rights. The harsh result this opinion may produce is a by-product of the theoretical basis of *Burford* abstention—abstention is proper because it would be improper for the federal court to become involved in the problem. "[T]his type of abstention calls for the surrender of federal jurisdiction, not its mere postponement".[6] *Construction Aggregates, supra,* 573 F.2d at 89. In *Barry v. St. Paul Fire & Marine Ins. Co.,* 555 F.2d 3, 12–13 (1st Cir. 1977), *aff'd on other grounds sub nom., St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), we upheld the

district court's decision to abstain on a question concerning insurance rates even though it was too late to challenge some of the rates administratively. Moreover, our decisions in *Construction Aggregates* and *Barry* foreshadowed this holding, if not clearly, at least to the extent that the result we reach today appeared a distinct possibility.

*Affirmed.*

---

**6.** This is in contrast to the consequences of abstention pursuant to the rationales of *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), both of which defer to the state court because it might resolve a state law question in such a way as to significantly alter the litigation in federal court, allowing the federal court to avoid a constitutional question or to avoid impacting on a state's efforts to implement its important public policy. Thus, if the state court's resolution does not obviate the problem, the case could return to federal court, assuming the parties have taken the appropriate steps to preserve the federal case. *See, e. g., England v. Louisiana School Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *Thibodaux, supra;* *Kartell v. Blue Shield of Massachusetts, Inc.,* 592 F.2d 1191, 1195 (1st Cir. 1979); 1A Moore's Federal Practice, ' 0.203[1] at page 2116, and ' 0.203[2] at pages 2122–23 n. 14 (1978).