[SEAL]

**NEW ENGLAND TELEPHONE & TELEGRAPH CO., Plaintiff,**

**v.**

**PUBLIC UTILITIES COMM'N OF MAINE, et al., Defendants.**

**Civ. No. 83–0166 P.**

United States District Court, D. Maine.

Jan. 31, 1984.

Ralph I. Lancaster, Jr., Everett P. Ingalls, Portland, Me., Robert A. Lewis, Boston, Mass., for plaintiff.

Joseph G. Donahue, Charles F. Dingman, William E. Furber, Augusta, Me., Peter L. Murray, Portland, Me., for defendants.

## OPINION AND ORDER

GENE CARTER, District Judge.

### HISTORICAL FACTS

On April 26, 1983, the Maine Public Utilities Commission (PUC) entered an order setting rates for the New England Telephone & Telegraph Co. (NET). That order used the whole life depreciation method (WLDM) as the basis for its rate calculation despite an order of the Federal Communications Commission prescribing the use of the remaining life depreciation method (RLDM). On September 20, 1983, this Court issued a Preliminary and Permanent Injunction requiring that the PUC determine NET's Maine intrastate revenue requirement resulting from the implementation of the FCC-mandated RLDM and rates.[1] 570 F.Supp. 1558. On September

---

1. The ordering paragraph of the September 20, 1984, Injunction provides:

 Compliance with this Preliminary and Permanent Injunction requires that Defendants: (1) obey the *Prescription* and *Preemption Orders;* (2) employ forthwith the FCC-prescribed remaining life depreciation methods and rates in setting Plaintiff's currently effective charges for service in Maine; (3) determine Plaintiff's increased Maine intrastate revenue

22, 1983, a PUC hearing examiner issued a procedural order requiring NET to file proposed rates reflecting the implementation of RLDM by September 23, 1983. Parties were invited to file written comments on the issue by September 27, 1983, and were ordered to inform the Commission by September 29, 1983, if they wished to offer testimony. On September 22, 1983, NET submitted a proposal for increased basic exchange rates and tariff sheets to achieve increased revenues of $1,667,000, the sum which it claimed would be generated by application of the new method based on the test period. By letter of September 23, 1983, NET objected to the PUC's institution of new proceedings.

On September 29, the PUC issued Supplemental Order No. 5 in which it determined that NET is entitled to receive $833,000 of increased revenues rather than the $1,667,000 claimed. The revenue adjustment had three components. First, it included a deduction of $78,000 to reflect an adjustment to antitrust expenses which had been determined in July 1983 but not put into effect until implementation subsequently became practical. Next, there was a deduction of $118,000 to reflect the proper quantification of a rate decision remanded by the Law Court. Neither of these two adjustments is challenged by NET.

The final adjustment, which is challenged, is a deduction from the increased revenue generated by use of RLDM of $636,000, reflecting a reduction in the cost of equity resulting from the decreased risk to investors precipitated by the change in depreciation policy. Supplemental Order No. 5 rejected NET's proposal that the additional revenues be allocated entirely to basic exchange services, directing instead that the new revenues be allocated among private line services, WATS services, basic exchange service and general services equipment/recurring in proportion to the

requirement resulting from current implementation of such method and rates; and (4) place into effect within ten (10) days from the date of this Order schedules of rates sufficient to generate increased revenues as so determined for the test period used in *New Eng-*

revenues already generated by these services.

By letter of September 30, NET proposed a 1% increase in monthly rates for the remainder of 1983 and an increase of 1.4% after January 1, 1984. At the same time NET objected to the reduction of increased revenues. By return letter of September 30, the Commission rejected NET's suggested percentage surcharge and set an interim rate of .75% which was subsequently raised to .79%. Also on September 30, the PUC issued Supplemental Order No. 6 setting forth the reasons for its rejection of the revenue increase proposal of NET and ordering again that NET allocate the new revenues over the four categories to arrive at an annual additional revenue of $833,000. In its Opinion explaining Supplemental Order No. 5, the Commission stated that it had recalculated the cost of equity in the Order because depreciation and cost of equity are linked, with a change in the first necessitating a change in the latter to reflect the altered risk for investors. The Commission explained that it had used its judgment in reassessing the cost of equity, from 14.1% to 13.9%, choosing a figure still within the reasonable range it had adopted in its initial April Order but which would also reflect the decreased risk caused by utilization of RLDM. The Opinion also explained the PUC's allocation of revenues as taking into account both established rate design policies and the loss in revenues that would be occasioned in general services equipment/recurring by the American Telephone & Telegraph divestiture. A concurring opinion by the Chairman gave as an additional reason for reducing the cost of equity that despite the fact that RLDM was supposed to promote modernization, NET had not directed its modernization efforts at Maine.

On October 3, NET filed a motion to compel the PUC to comply with the Court's

*land Tel. & Tel. Co., re: Proposed Increase in Rates,* No. 82–124 (Me. Pub. Util. Comm'n, April 26, 1982), resulting from implementation by Defendants of the remaining life depreciation rates.

injunction. On October 5, 1983, NET discussed with the PUC the fact that it would lose much of the increased revenues based on general services equipment because of the AT & T divestiture. In a letter of October 11, Defendant's Exhibit 10, addressing loss of revenues because of divestiture, NET informed the PUC that it would file "revised rates" on December 1 to deal specifically with the problem. No such filing had been made as of the hearing in this Court on NET's Motion for Compliance.

The question presented by the motion now before the Court is whether the PUC has complied with the Court's injunction. In essence, NET's argument is that the injunction, without stating an exact dollar amount for the revenue increase associated with implementation of RLDM, contemplated a figure equal to or close to the $1,667,000 that the PUC had admitted in its pleadings before this Court would be the increased revenue generated if RLDM, rather than WLDM, were applied in the test year. *See* Defendant's Answer, ¶ 7. NET asserts, therefore, that the PUC's conduct in reopening the rate case and, based on a downward adjustment to the cost of equity, setting a lower revenue increase is, in effect, bad faith noncompliance with the sense of the Court's injunction. The PUC contends, on the other hand, that it had statutory authority to reopen and amend a previously fixed rate and that it was bound to do so because of the intimate relationship between a change in depreciation method, as prescribed by this Court's injunction, and a utility's cost of equity.

In order to assess whether the Commission has acted in compliance with this Court's Order, the Court must determine whether the Commission's actions are, at least facially, legitimately available to it under applicable Maine law. Although this Court is not bound by state law in making such a determination, state law provides an accurate guideline since it sets the standards for legally permissible Commission action.

NET's three primary arguments concerning the PUC's alleged noncompliance are intertwined with state law standards.

They are that (1) the PUC did not follow appropriate statutory procedures in altering its April rate order which the Court had ordered brought into compliance with the FCC's prescription order; (2) there is no evidentiary basis for the cost of equity reduction from 14.1% to 13.9%; (3) the rate design imposed by the PUC to effect the Court-ordered changes prevents NET from recovering the full amount of additional revenues after January 1, 1984, the date of NET's separation from its former parent company, American Telephone and Telegraph.

The Court held an evidentiary hearing on the issue of compliance on December 9, 1983. After careful consideration of the evidence and the written and oral submissions of counsel, the Court finds that the PUC has complied with this Court's injunction of September 20, 1983.

## PROCEDURAL REGULARITY

NET first asserts that the PUC's cost of equity adjustment to NET's rates is void because NET failed to provide either a formal hearing on the reduction or adequate notice of the reopening proceeding and its substance. This Court's injunction required the PUC, *inter alia,* to

(3) determine Plaintiff's increased Maine intra-state revenue requirement resulting from implementation of [the FCC-prescribed remaining life depreciation] methods and rates; and (4) place into effect within ten (10) days from the date of this Order schedules of rates sufficient to generate increased revenues as so determined for the test period used in *New England Telephone and Telegraph Co., re Proposed Increase in Rates,* No. 82–124 (Me. Pub. Util. Comm'n, April 26, 1982) resulting from implementation by Defendants of the remaining life depreciation rates.

The PUC, proceeding under state law, 35 M.R.S.A. § 306 (1978), reopened rate case 82–124 by issuing a procedural order requesting that NET file proposed rates reflecting the implementation of RLDM. The order also sought written

comments on the rates to be set and asked interested parties to request a hearing if they so desired. NET filed a written tariff proposal and rate design but did not request a hearing. Subsequently, the PUC determined Plaintiff's increased intrastate revenue requirement and put it into effect within the ten days specified in the injunction. Those actions of the Commission meet the express terms of the injunction.

 The Commission has complied with the Court's order while facially meeting the requirements of state law. Hence, there is no need for this Court to venture upon any predictive judgment as to what the Maine Court may subsequently say is the substantive content of the procedural requirements for administrative action. The Commission is a creature of Maine state law and Maine statutes govern its procedure. Moreover, Maine law expressly provides for direct review of Commission action by the Law Court. *See* 35 M.R.S.A. §§ 303, 305 (1978). A determination of the adequacy of the PUC's procedure will require particularized interpretation of that law. When adequate state court review of a state administrative order is available and federal intervention might interfere with the state's efforts to develop a coherent policy on matters of substantial public concern, it is the policy of the federal courts to abstain from engaging in such review. C. Wright, *Law of Federal Courts* 311 (1983); *see Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Alabama Public Service Comm'n v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Allstate Insurance Co. v. Sabbagh,* 603 F.2d 228 (1st Cir.1979). Thus, it is appropriate that the required "particularized interpretation" be done by the state court. In deference to the independence of the Maine state courts in the regulatory sphere, this Court abstains from exercising its jurisdiction to determine whether the PUC followed the full rigor of statutorily prescribed procedures in setting NET's rates.

## REDUCTION IN COST OF EQUITY

In determining NET's intrastate revenue requirements based on the implementation of RLDM, the PUC effected a downward adjustment in NET's cost of equity capital from 14.1% to 13.9%. The PUC based this reduction on the premise that the more rapid capital recovery provided by RLDM reduces the investors' risk, thus warranting a reduction in the cost of equity percentage used to calculate NET's rates. NET argues, however, that the PUC had no evidentiary basis for its reduction of the cost of equity. NET seeks to demonstrate the PUC's noncompliance with this Court's injunction by showing that the Commission's substantive decision violates standards of state law. There is no other evidence in this record upon which this Court could base a finding of noncompliance. Therefore, the Court may adequately assess the issue of PUC compliance by determining the likelihood that its substantive decision would be upheld by the Maine Court applying Maine legal standards.

 The standard of review applied to PUC rate determinations by Maine law is an extremely broad and deferential one. Ratemaking is regarded as an inexact science; therefore, a "just and reasonable" standard is applied. "It is not theory, but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Central Maine Power v. Public Utilities Commission,* 455 A.2d 34, 38 (1983) (quoting *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944)). The Law Court regards deference to the workings of the PUC as particularly appropriate in reviewing determinations of the cost of equity:

Determining the cost of equity is one of the most difficult computations in the rate making process. The Commission must concern itself with many economic variables and evaluate conflicting evidence interpreting and applying those variables. Because of the complexity of

the task, the Law Court necessarily defers to the regulatory expertise of the Commission if the Commission's decision is supported by substantial evidence. We do not attempt to second-guess the Commission on matters falling within its realm of expertise. Our review is limited to determining in the light of the record whether the Commission's conclusions are unreasonable, unjust or unlawful. The utility has the burden of proving that the Commission has erred. 35 M.R. S.A. § 307 (1978).

*Central Maine Power Co. v. Public Utilities Commission,* 455 A.2d 34 (Me.1983) (quoting *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 448 A.2d 272, 287–88 (Me.1982)). It is clear, then, that in a reopened proceeding the only expectation of the Commission on review by the state court would be that its result be just and reasonable and supported by substantial evidence.[2] This Court realizes also that in assessing the Commission's compliance with its injunction, a rate that would be upheld upon state review as reasonable and just cannot be rejected by this Court merely because it differs from that which was expected on the pleadings as they exist in this Court.

Before adopting its previously imposed cost of equity figure of 14.1%, the PUC heard testimony from seven witnesses who, applying differing methods, suggested that NET's cost of equity could be reasonably set between 11.5% and 19.5%. Accepting as reasonable the stock price range of Mr. Cogswell, *one* of the experts, the Commission chose the midpoint of his range and used that figure as the basis for its calculations of the cost of equity. NET does not assert here that the Commission's choice of the 14.1% figure was unreasonable. Neither did it challenge that figure in its appeal to the Law Court of the rate order in 82–124. *See New England Telephone &*

*Telegraph Co. v. Public Utilities Commission,* 470 A.2d 772 (Me.1984). Thus, our inquiry must initially accept 14.1% as a reasonable cost of equity figure.

NET asserts that there is no record support for the reduction of that figure to 13.9%. In the PUC's April Order, the Commission stated:

> We note also, as the FCC has, that depreciation and capital recovery are overlapping concepts. To the extent that depreciation is more rapid, capital recovery is quicker and more certain. Thus, the risks to investors are reduced. Our return on equity allowance in this case assumes that our depreciation practices are controlling. If different depreciation rates are used, our estimate of the risk to investors would vary as well. Consequently, no change can be made to depreciation without a reappraisal of the allowed return on equity as well.

PUC Order No. 82–124, at 36 (April 26, 1983).

As the PUC has argued, the above-quoted theoretical premise finds record support in the rebuttal testimony of Dr. Lee Selwyn presented in the original proceeding on 82–124. Defendant's Exhibit 16. Even if it did not, however, it is clear that administrators in rule-making or rate-making proceedings may go outside the record to find the legislative facts they need in order to decide what course of action to take. *See* 1 K. Davis, *Administrative Law Treatise* § 6:17 at 530 (1978). This proposition was adverted to by the Law Court when it stated in *Mars Hill & Blaine Water Co. v. Public Utilities Commission,* 397 A.2d 570, 576 (Me.1979):

> The methodology used by the Commission in its rate-making determinations need not be suggested by any witness in the record. The methodology itself lies within the Commission's expertise and

**2.** It is not for this Court to determine whether the law of Maine as determined by the Law Court is rationally based, wise or sound. For this Court to even undertake such a determination arguably would have Eleventh Amendment implications. *See Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 104 S.Ct.

900, 79 L.Ed.2d 67 (1984). The conclusion that this Court must accept the validity of the rationale of the *Central Maine Power* case comes only with a formidable exertion of judicial discipline and restraint. *See Central Maine Power Co. v. Public Utilities Commission,* Me., 445 A.2d at 44 (Carter, J., dissenting).

discretion and is subject only to a test of reasonableness. If the methodology is reasonable, then the result will not be disturbed if the factual findings employed in that methodology are supported by the record.

This Court does not find unreasonable the premise that cost of equity and depreciation methodology are interrelated in the manner suggested by the PUC.[3]

■ Similarly, the Court does not find unreasonable or unjust the actual quantification of the reduction. It falls within the wide range of reasonable rates suggested by the witnesses at the earlier proceeding. Moreover, even if it did not, if one accepts the PUC's adjustment premise as reasonable, a downward adjustment of .2% from an admittedly reasonable rate calculated on a different premise is not *per se* unjust. As the Maine Law Court stated in *Mars Hill:*

> The Commission is not bound to use only those figures recommended by witnesses. On the basis of evidence in the record and with the use of its own expertise, it may make its own informed judgment as to the proper cost of equity, whether or not that cost is specifically recommended by any witness.

*Id.* at 587.

## RATE DESIGN

■ NET complains that the rate design chosen to implement the remaining life depreciation method does not comply with the spirit of the injunction since it provides that a large part of the prescribed revenue increase will come from general services equipment recurring, a category of services which NET stopped providing as of January 1, 1984. As the previous section made plain, great deference is paid to the Commission's rate-making processes. These include, of course, rate design. As the Law Court stated in *New England Telephone & Telegraph Co. v. Public Utilities Commis-*

*sion,* 390 A.2d 8, 31 (Me.1978): "The Public Utilities Commission must exercise its own expertise and skill in the setting of rates, and the court may not interfere with its decision if they are reasonable and supported by substantial evidence."

■ The rate design chosen by the PUC is neither unreasonable nor unsupported by the evidence. NET had requested a very large increase in general services equipment/recurring in the proceeding culminating in the April Order of the PUC. That order provided such an increase but at a figure and percentage less than that requested. NET did not challenge that order, either by appeal or through a reopening proceeding, on the grounds that the allotment of the rate increase to general services equipment/recurring would deprive them of anticipated revenues upon divestiture. Moreover, it is clear that had the PUC adopted RLDM in its April Order, thus precluding the instant action, the rate design would still have apportioned part of the revenue increase to general services equipment/recurring, which presumably would have gone unchallenged.

The PUC in its April 26 rate order specifically addressed the question of divestiture, refusing to use it as a basis for its calculations of the revenue increase: "We have assumed that an early rate filing from the Company is likely if the net impacts of divestiture are substantially to its disadvantage." PUC Order No. 82–124 at 113 (April 26, 1983). NET's witnesses testified at the hearing in this Court that a new rate case had in fact been filed addressing prospectively the impact of divestiture upon NET's revenue requirements. That issue is, therefore, presently before the PUC for determination.

The decision of the PUC resolving that issue will, however, speak only as of the date on which it is made. Thus, there remains unaddressed the matter of NET's

---

**3.** It seems clear that when the administrative body relies on an extra-record legislative fact in setting rates or making rules, the opposing party should be provided adequate notice of that reliance in order to have the opportunity to challenge the fact. *See* K. Davis, *supra,* § 6:17 at 528. Whether NET had adequate notice that the

Commission planned to adjust the cost of equity to reflect the prescribed change in depreciation methodology is not properly subject to dispute here. As discussed above, the determination is one to be made under Maine law by Maine courts.

loss of those additional revenues generated by the implementation of RLDM, that loss being caused by the PUC's challenged rate design during the period between January 1, 1984, and the date of the PUC's decision in the pending rate case. The record before this Court shows that in discussions with the Commission as of October 11, 1983, NET was aware that a loss of these additional revenues would occur as of January 1, 1984, as a result of the effect of the divestiture. NET did in fact indicate that it would file by December 1, 1983, "[r]evised rate schedules to reflect the loss of General Services and Equipment for the purpose of providing the Commission with adequate time to review that material." Defendant's Exhibit 10. NET so acknowledges in written argument in these proceedings. NET's Post Hearing Memorandum at 13. NET also acknowledges, however, that as a result of a conscious decision of NET's officials, the contemplated December 1 filing of a revised tariff did not occur. *Id.* Had that filing been made, the possibility cannot be excluded that the Commission would have addressed this issue promptly. If that had occurred, the adequacy of the PUC's response would be properly postured for review by this Court in the present proceedings. The effect of NET's conscious decision not to file the revised tariffs, as it indicated it would do, is that the issue of the propriety of the PUC's chosen rate design for the interim period specified is not generated in these proceedings.

The Court also observes that had the proposed filings been made, NET would have had an adequate remedy by way of

judicial review under state law of the PUC's resolution of the rate design question for this interim period. In any event, NET was provided, conditioned upon its timely application, with adequate judicial review under state law of the PUC's Supplemental Order Nos. 5 and 6. Thus, NET cannot now seek the benefit of this Court's resolution of an issue not generated here as to which it had an adequate remedy of judicial review under state law.

Further, this Court does not find the rate design imposed by the PUC to be unreasonable, applying state law standards. The rate design, in the aspect complained about here, basically conforms to the unchallenged rate design established in the April Order, while making some adjustments to mitigate some of the harsh effects of allocating the increase to general services equipment/recurring.[4]

On the basis of the record before it, the Court finds that the PUC has complied with the September 20th injunction. No specific showing of bad faith has been made by NET on this record and the PUC's actions in implementing RLDM appear to be those which were, facially, legitimately available to them under applicable state law.

Accordingly, NET's motion that the Court order Defendants to comply with the Court's injunction is hereby DENIED.

So ORDERED.

---

**4.** The PUC Opinion of September 30, 1983, states in this respect:

> Rigid adherence to the Commission's April 26th Order would require the allocation of the additional revenues to General Services Equipment recurring and WATS Services. We are reluctant, however, to impose this rate design due to the consequences of the transfer of NET's terminal equipment to AT & T, on or about January 1, 1984. On January 1, 1984, NET's existing terminal equipment will be transferred to AT & T together with the associated revenues and costs. To the extent that the revenues derived from this equipment exceed the associated costs, NET will experience

a net revenue loss. While the precise revenue-cost relationships are not known, we are hesitant to allocate the majority of the additional revenue requirement to General Service and Equipment-recurring charges. For this reason, we will increase the number of services over which the additional revenues may be allocated to include the major categories for which revenues were established on a formula basis. In this fashion, we will preserve the rate design policies established in the Commission's April 26 Order without allocating a substantial portion of the additional revenues to the General Service and Equipment category.