BATH MEMORIAL HOSPITAL, et al.,
Plaintiffs, Appellants,

v.

MAINE HEALTH CARE FINANCE
COMMISSION, et al.,
Defendants, Appellees.

BATH MEMORIAL HOSPITAL, et al.,
Plaintiffs, Appellees,

v.

MAINE HEALTH CARE FINANCE
COMMISSION, et al.,
Defendants, Appellants.

Nos. 87–2103, 88–1168.

United States Court of Appeals,
First Circuit.

Heard May 5, 1988.
Decided Aug. 8, 1988.

---

Joseph M. Kozak with whom Jay H. Krall and Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., were on brief, for plaintiffs, appellants.

William F. Julavits, Gen. Counsel, John P. Doyle, Jr., and Preti, Flaherty, Beliveau & Pachios, Portland, Me., on brief, for Maine Hosp. Ass'n, amicus curiae.

Charles F. Dingman with whom Lucinda E. White, Augusta, Me., Suzanne M. Gresser, Richmond, Me., and Gail Drake Wright, Augusta, Me., were on brief, for Maine Health Care Finance Com'n.

T. Christopher Beach, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., Augusta, Me., was on brief, for defendant, appellee Maine Dept. of Human Services.

Before BREYER and TORRUELLA, Circuit Judges, and FUSTE,* District Judge.

BREYER, Circuit Judge.

Several Maine hospitals asked the federal district court to declare unconstitutional, and to enjoin the application of, certain

* Of the District of Puerto Rico, sitting by designa-    tion.

specific provisions of a Maine statute that regulates hospital charges. 28 U.S.C. §§ 2201, 1331 and 42 U.S.C. § 1983 (1982); Me.Rev.Stat.Ann. tit. 22, §§ 381–99 (Supp. 1987). The district court decided to "abstain" from deciding the federal questions that the hospitals presented, in part because the court feared that to decide them would significantly interfere with Maine's ability to operate its regulatory system, *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and in part because it believed the hospitals could raise (or had raised) the same issues in ongoing state litigation. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Accordingly, the court dismissed the Hospitals' complaint. *Bath Memorial Hospital v. Maine Health Care Finance Commission*, 673 F.Supp. 628 (D.Me.1987). They have appealed. Mindful of the Supreme Court's admonition that "abstention from the exercise of federal jurisdiction is the exception, not the rule," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983) (quoting *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244), we have determined that (with two exceptions) the law does not permit the district court to "abstain" from deciding the federal questions at issue in this case.

## I

### Background

### A

### The Statute

Maine's hospital charge regulatory scheme is similar to traditional rate setting systems in that the legislature created a Commission (the Maine Health Care Finance Commission), which determines the regulated firm's "revenue requirement" (based on costs) and sets rates designed to yield that "revenue requirement." Maine's system is somewhat special, however, in that the Commission is required, after finding a hospital's costs, to determine what revenue the hospital will likely receive from sources the Commission does not directly control. The statute assumes the use of these unregulated funds to meet a portion of the hospital's costs. The Commission then sets rates to raise enough money from other sources to meet the *rest* of the hospital's revenue needs. § 396–H. Moreover, in setting those rates, the Commission takes account of the fact that third-party payors (*e.g.,* insurance companies) will likely pay something less than the rates the Commission sets, *i.e.,* they will pay rates that have been reduced by discounts or "differentials." § 396–G. The Commission takes particular account of the fact that one third-party payor, Medicare, will reimburse hospitals according to its own rates, which the Commission cannot easily change. §§ 396–A(1), 396–D(9–A) (A) (1), 396–E, 396–G(4), 396–M.

On the basis of a stipulation in the record, we have developed a simplified version of how we believe the rate setting process works, a process that we break down into three basic parts: (1) determining the hospital's total costs and consequent revenue need; (2) determining how much of that global revenue need the hospital can fill with, *e.g.,* non-Commission controlled revenue sources; (3) determining what rates to set to fill the remaining revenue gap.

*Step one: Global Revenue Need*

a. The Commission determines the hospital's costs in a particular base year. §§ 396–A, 396–B.

b. The Commission adjusts the base year costs to reflect likely future costs, in light of, *e.g.,* inflation. §§ 396–C, 396–D.

c. We can call the resulting figure "global financial requirements" or "GFR."

*Step two: Meeting Global Needs With "Unregulated" Revenues*

a. The Commission calculates the money the hospital will receive from government grants, certain earmarked gifts, and certain interest the hospital receives on funds it has set aside to pay off bonds. It calls these funds "available resources," or "AR." § 396–E.

b. The Commission subtracts "available resources" from "global financial requirements" and arrives at a figure representing revenue the hospital must find elsewhere. It calls this remaining amount "financial requirements net of available resources" which the Commission labels "N." (N = GFR − AR) The hospital must collect N from its patients (or from third-party payors) in order to balance its budget.

c. The Commission subtracts another kind of revenue (over which it has no control) namely, Medicare payments, (which it labels "A"). We can call the result (N − A) "remaining N." "Remaining N" is the amount the hospital must collect from non-Medicare patients (or their insurers) in order to balance its budget. "Remaining N" plus "A" plus "AR" will equal the hospital's "global financial requirement." The significance of "remaining N" is that it represents the area of revenue in respect to which the Commission has direct power to fix rates. §§ 396–A(1), 396–H(A).

*Step three: Setting Rates Sufficient To Yield "Remaining N"*

a. The Commission set rates that, when multiplied by the services used by non-Medicare patients, will yield revenues in an amount equal to "remaining N." These rates are somewhat higher than what many of the patients (or insurers) actually pay because (1) some patients are charity cases and pay nothing, and (2) hospitals typically offer a discount (or subtract a "differential" from standard rates) to certain third-party payors, such as Blue Cross/Blue Shield. Were there no such charity cases or discounts, the Commission-set rates would yield (on paper) a figure greater than "remaining N." The Commission calls this larger figure the "gross patient service revenue limit" or G. §§ 396–F, 396–G, 396–H, 398.

b. The Commission divides G among non-Medicare hospital service buyers, roughly in proportion to their use. It directs the hospital to charge Blue Cross/Blue Shield, Medicaid, other insurance companies, and uninsured persons, rates, such that, were all *fully* paid, they would yield G, but, because they are not all *fully* paid, they yield "remaining N," or "N–A." As we have said, "remaining N" ("N − A") when added together with the Medicare payments the hospital will receive ("A") and likely receipts from special revenue sources such as gifts and interest on debt retirement sinking funds ("AR"), will provide the hospital's global financial requirements ("GFR"). § 396–I(2).

The basic point that the reader must remember is the statute instructs the Commission to set rates that will fill a certain revenue gap—the gap between the hospital's total financial need and the revenues that it will receive from Medicare and from certain "available resources" (such as gifts and government grants). §§ 396–A(1), 396–H.

The reader should also be aware that the Commission, in determining revenue needs, must determine costs, and, in doing so, it must consider one particularly difficult matter, namely new investment. The statute says that the Commission will permit the hospital to cover the cost of a new investment only if the Maine Department of Human Services has issued a "Certificate of Need" and the Commission finds that the investment expenses do not exceed annual limits (previously set through Commission rulemaking) on the statewide costs of new hospital projects. § 396–K(3)(A), (C).

With this background, the reader should be able to understand the Hospitals' legal claims.

B

*The Hospitals' Legal Claims*

In this complaint, the Hospitals basically assert the following claims:

1. *Medicare.* The Hospitals point out that Congress, in 1983, enacted a new Medicare statute that requires Medicare to pay fixed sums to hospitals for performing a particular service under a "prospective

payment system." If, in any individual case, the hospital performs that service at a lower *actual* cost, it can keep the difference; if it performs the service at a higher actual cost, it must swallow the loss. 42 U.S.C. § 1395ww(d) (Supp. I 1983 & Supp. V 1987). The "prospective payment system" is "intended to create incentives for hospitals to operate in a more efficient manner." Sen Rep. No. 23, 98th Cong., 1st Sess. 47, *reprinted in* 1983 U.S. Code Cong. & Admin. News, 143, 187. The statute adds that a state that wants to regulate hospitals in a manner "not in accord with the other provisions of" the Medicare statute may apply to the Secretary of Health and Human Services to secure a waiver. 42 U.S.C. § 1395ww(c) (Supp I 1983, Supp. V 1987). Under some circumstances, the Secretary has discretion whether to grant approval, § 1395ww(c)(1), and under other circumstances the Secretary must grant approval to a state program. § 1395ww(c)(4), (c)(5).

The Hospitals argue that Maine's statutory system is "not in accord with" the "incentive" objective of the Medicare prospective payment system. Maine, in deciding how much a hospital can charge non–Medicare users, subtracts actual Medicare reimbursements from the hospital's total actual costs (*i.e.*, from its "financial requirements"). § 396–A(1). It then charges the other users just enough money to cover the remaining costs. § 396–I(2). That fact, say the Hospitals, destroys the "incentive." Suppose, for example, Hospital A (subject to the Maine scheme here at issue) is so efficient that it can provide, for $3 million, service that would cost any other hospital $4 million to provide. Assume Hospital A obtains all of its income from its patients or insurers, (*i.e.* it has no "available resources"). Assume further that Hospital A's Medicare patients account for 25 percent of the hospital's costs; and, consequently, Medicare pays Hospital A $1 million (or 25 percent of $4 million) for those patients (whom this efficient hospital can serve for $750,000, or 25 percent of $3 million). Instead of letting Hospital A keep the $250,000 that it saved, the Commission would subtract the full $1 million

of Medicare reimbursement from Hospital A's total costs of $3 million, permitting it to recover only $2 million from its other payors, rather than, say, the $2,250,000 that represents the hospital's actual costs (75 percent of $3 million) of serving those non–Medicare patients. The result is that these other customers (or their insurers), not Hospital A, would receive (through mandated lower rates) the benefit of Medicare's $250,000 excess, efficiency incentive, payment. For this reason, Maine, in the Hospitals' view, is operating a system that is not "in accordance with" federal law.

The parties stipulate that although the statute orders the Commission to apply to the Secretary of Health and Human Services for a Medicare "waiver" to obtain federal approval of its revenue limiting system, § 396–M, the Commission has not yet done so; and, the Hospitals believe that Congress has preempted the state's power to operate such an "unwaived" system. For these reasons, they say, Maine's system violates the Supremacy Clause of the federal Constitution. U.S. Const. Art. VI.

The Hospitals further argue that, by applying the Hospitals' Medicare "profits" to reduce the rates the Hospitals can charge to non-Medicare payors, Maine "confiscates" their property in violation of the Fourteenth Amendment, and by impairing the Hospitals' contracts with Medicare, it violates the Constitution's Contract Clause. U.S. Const. Art. I, § 10. (The Commission and the Department, of course, have provided answers to these arguments, but we are here concerned with the claims, not the answers.)

2. *Legal Costs.* The Hospitals point out that Maine's statute permits the Commission to allow them to recover their legal, and related accounting costs, in respect to legal appeals of Commission decisions that "are associated with the issues on which the hospital *has prevailed* in court," Me. Rev.Stat. Ann. tit. 22, § 396–D(9)(D) (Supp. 1987) (emphasis added). This statute, they say, does not permit the Commission to allow them to recover costs associated with *un*successful appeals. This determination,

in their view, violates the Due Process Clause of the Fourteenth Amendment.

3. *Gifts and Sinking Fund Interest.* The Hospitals point out that the Maine statute requires the Commission to subtract, from their actual costs, certain revenues that the hospitals receive from gifts that donors earmarked to pay for particular costs. § 396–E(1)(D). It also requires the Commission to subtract from the costs of financing allowed capital projects, the interest that the hospitals earn on sinking funds (money set aside to pay back interest and principal on their debt). § 396–E(1)(F). The Hospitals claim that these provisions of Maine law violate the "contracts" and "due process" clauses of the Constitution. U.S. Const. Art. I, § 10; amend. XIV.

4. *Deferring Investment.* The Hospitals say that the Commission, despite the Department's decision to grant a "certificate of need" permitting a hospital to undertake new investment, sometimes defers that hospital's right to use that certificate to construct the needed facility. The Commission does so to keep total state hospital-related new facilities within an overall "cost cap" limit. § 396–K. The Hospitals add that the Commission, in deciding *which* facilities to defer, does not use appropriate standards; indeed, they say it uses no standards at all. That fact, they say, violates the "due process" clause. U.S. Const. amend. XIV.

## II

### Abstention

The principal legal issue that this appeal presents is not whether the claims of the Hospitals are legally right or wrong; it is whether the district court has legal power to refuse to decide the questions presented in I(B) above, for reasons related to "abstention," a term that can refer to several different reasons federal courts sometimes have for refusing to decide a legal question (in a case where federal jurisdiction is proper), while leaving the plaintiff free to pursue his legal claims in a state court. These reasons typically concern "comity," the notions that certain matters are of state concern to the point where federal courts

should hesitate to intrude; and they may also concern judicial "economy," the notion that courts should avoid making duplicate efforts or unnecessarily deciding difficult questions. *See, e.g., Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed.2d 971 ("These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion,' restrain their authority because of scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." (Frankfurter, J.) (citations omitted)).

Federal courts have applied the "abstention doctrine" in a number of different contexts. A federal court may, for example, stay its consideration of a case until a state court decides an issue of state law in the case that will end the controversy without need for a resolution of a federal constitutional question, or that, at least, will make resolution of the federal question somewhat easier. *Pullman, supra; Cuesnongle v. Ramos*, 835 F.2d 1486 (1st Cir.1987); 17A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4242 (1988) (hereinafter "Wright, Miller & Cooper"). A federal court, by abstaining, may avoid the awkward circumstance of turning the federal court into a forum that will effectively decide a host of detailed state regulatory matters, to the point where the presence of the federal court, as a regulatory decision-making center, makes it significantly more difficult for the state to operate its regulatory system. *Burford, supra; Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Allstate Insurance Co. v. Sabbagh*, 603 F.2d 228 (1st Cir.1979). Wright, Miller & Cooper, § 4244. A federal court, by abstaining, may avoid having to decide a uniquely difficult question of state law of great local impact and uniquely important local concern (even though there is no federal constitutional issue to avoid deciding as in *Pullman, supra* ); *Louisiana Power*

*& Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Wright, Miller & Cooper § 4246. A federal court, by refusing to decide a particular question, may avoid having to enjoin or interfere with a specially important state proceeding that is "judicial in nature." *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Wright, Miller & Cooper §§ 4251–55. There may also be other reasons, related to "judicial economy," or "comity," for a court to decline to decide a case over which it has jurisdiction. *See Moses H. Cone, supra; Colorado River, supra;* Wright, Miller & Cooper § 4247.

The Supreme Court, of course, has made very clear that all of these circumstances, whether or not formally labelled "abstention," are unusual circumstances; they constitute an "exception," not the "rule." *Moses H. Cone,* 460 U.S. at 14, 103 S.Ct. at 936; *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244. Ordinarily, a federal court will exercise the jurisdictional power that Congress has conferred upon it when a plaintiff invokes its jurisdictional authority to apply federal law. *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). The issue before us now is whether the particular claims that the plaintiffs raise here fall within the "exception."

### A

■ In our view, the "Medicare" claim and the "legal costs" claim do not fall within the exception. The district court lacked the power to abstain. First, we conclude that *Pullman*-type abstention is inappropriate. There is no issue of state law the decision of which would likely avoid the need to decide the federal questions. Rather, the Hospitals' legal attack consists simply of pointing to those sections of the Maine statute itself that set forth the rate-making scheme described above, §§ 396–A —396–I, and the section that says the Commission may allow attorney costs for *successful* appeals, § 396–D(9)(D). They ar-

gue, in the one instance, that federal Medicare law preempts the state statutory sections; and, in the other, that the "due process" clause makes the provision unlawful. The appellees have not explained to us how resolution of any state law question could make it easier to decide these federal questions. In fact, the district court did not rest its abstention decision on *Pullman* grounds. *Bath,* 673 F.Supp. at 632–34.

■ We also conclude (contrary to the district court) that *Burford*-type abstention is not appropriate. Federal courts abstained in *Burford, supra,* and in similar cases, such as *Alabama PSC, supra,* and *Sabbagh, supra,* when they feared that excessive federal court intervention unnecessarily threatened to impede significantly the ongoing administration of a state regulatory system. The threatened interference did not consist merely of the threat that the federal court might declare the *entire state system* unconstitutional; that sort of risk is present whenever one attacks a state law on constitutional grounds in a federal court. *See Zablocki v. Redhail,* 434 U.S. 374, 379–80 n. 5, 98 S.Ct. 673, 677–78 n. 5, 54 L.Ed.2d 618 (1978) ("there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy"); *Urbanizadora Versalles, Inc. v. Rivera Rios,* 701 F.2d 993 (1st Cir.1983); *Construction Aggregates Corp. v. Rivera De Vicenty,* 573 F.2d 86, 92 (1st Cir.1978); Wright, Miller & Cooper, § 4244, n. 12. Rather, in our view, abstention in the *Burford* line of cases rested upon the threat to the proper administration of a *constitutional* state regulatory system. The threat was that the federal court might, in the context of the state regulatory scheme, create a parallel, additional, federal, 'regulatory review' mechanism, the existence of which would significantly increase the difficulty of administering the state regulatory scheme. It was this special and unusual "institutional threat" that, in our view, led the federal courts to abstain.

To be more specific, in *Burford,* the plaintiff, invoking diversity jurisdiction,

asked a federal court to decide that, as a matter of state law, it was entitled to a state oil permit that would have given it a right to remove oil through its wells from a field where large numbers of other producers also had wells. A state agency, the Texas Railroad Commission, was in charge of deciding just who could withdraw what oil from a commonly drilled field, a highly technical question, and one of great local importance, for the Texas Railroad Commission, through this regulation, sought to impose restrictions on supply that would keep interstate oil prices high. *See Burford*, 319 U.S. at 318–26, 63 S.Ct. at 1099–104; D. Pringle, *Petroleum Politics and the Texas Railroad Commission*, 19–69 (1981); Marshall and Meyers, "Legal Planning of Petroleum Production," 41 Yale L.J. 33 (1931), *cited in Burford*, 319 U.S. at 320–21, 63 S.Ct. at 1100–01, n. 12. Moreover, because the field was commonly drilled, one person's withdrawal of oil affected every other person's oil reserves and potential profits. Because of the need, in terms of both economics and equity, to achieve a consistent set of decisions (and the fact that changing economic conditions could require rapidly changing decisions) the state statute had centralized all judicial review in a single Texas state court. As the Supreme Court pointed out, in these circumstances, the presence of a federal court as an independent forum of review for individual licensing decisions based on a balancing of factually-based local interests created a risk of inconsistency (between diversity cases and others) that could have threatened the viability of the Texas regulatory scheme.

Similarly, the Supreme Court in *Alabama PSC, supra,* and this court, in *Sabbagh, supra,* faced claims that individual decisions of regulators (forbidding abandonment of a railroad spur line in *Alabama PSC;* setting a particular insurance company's yearly rates in *Sabbagh* ) were unreasonable. The plaintiffs' federal claims in these cases were dressed in constitutional clothing, charging unconstitutional "confiscation" of their property. *Cf., e.g., Federal Power Commission v. Hope Natural Gas Company,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). A "confiscation" claim, however, is a rather special claim in that it has often required the court to review *individual* firm costs and related *individualized* factual circumstances. *Cf. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (making such determinations); *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898) (same); *Hope Natural Gas,* 320 U.S. at 591, 64 S.Ct. at 281. Indeed, the Supreme Court noted in *Alabama PSC* that the federal court had "been asked to intervene in resolving the essentially local problem of balancing the loss to the railroad from continued operation of trains Nos. 7 and 8 with the public need for the service in Tuscumbia, Decatur, Huntsville, Scottsboro, and the other Alabama communities directly affected." 341 U.S. at 347–48, 71 S.Ct. at 767–68. To permit the federal court to determine such a claim, even if the plaintiff asserted it as a federal constitutional challenge to the individual state regulatory action, threatened the same kind of "comity-related" harm as the Court found in *Burford,* namely that regular use of the federal courts to conduct highly individualized review of particular, firm-specific regulatory decisions, would make it significantly more difficult for the state to administer its lawful regulatory system. This, we think, is why the Supreme Court later characterized federal court review in such circumstances as creating an "impermissibly disruptive effect on state policy." *Colorado River,* 424 U.S. at 815, 96 S.Ct. at 1245, and why this circuit found roughly similar circumstances warranting abstention in *Sabbagh,* 603 F.2d at 230–33.

The case before us now is, in a sense, the polar opposite of *Burford, Alabama PSC* and *Sabbagh.* The plaintiffs do not seek individualized review of fact- (or cost-) specific regulatory decision making. To the contrary, they attack the statute as it is written. Permitting a federal court to decide this kind of constitutional claim would not interfere significantly with the workings of a lawful state system, as such intervention threatened in *Burford, Ala-*

*bama PSC,* or *Sabbagh.* Review here would not threaten to create in the federal court a parallel regulatory review institution. The risks of interference here seem no greater that those present whenever a federal court decides whether a state regulatory statute is constitutional. *Cf. Kennecott Corp. v. Smith,* 637 F.2d 181, 185 (3d Cir.1980) ("supremacy clause claims are 'essentially one[s] of federal policy,' so that 'the federal courts are particularly appropriate bodies for the application of preemption principles.' " ) (citations omitted); *Construction Aggregates,* 573 F.2d at 92, Wright, Miller & Cooper, § 4244, n. 13. Indeed, this case is similar to *Medical Malpractice Joint Underwriting Association of Rhode Island v. Pfeiffer,* 832 F.2d 240 (1st Cir.1987) where the plaintiff insurance companies challenged a legislative decision to suspend rate-making hearings for a given year. At issue was *not* any fact-based agency determinations, but a legislative enactment with a clear meaning not subject to modification or interpretation in the agency regulatory process. We found there, and we find here, no reason for abstention.

Further, comity-related cases, such as *Younger* and *Middlesex County,* are beside the point, for those cases involved a federal decision that threatened to interfere with a state-initiated judicial proceeding. Wright, Miller & Cooper, § 4253. There is no threat of interference here.

Finally, we note that the district court did refer to the pendency of state cases challenging the legality of Maine's regulatory system as an additional reason for refusing to decide the case on the merits, *Bath,* 673 F.Supp. at 632 & n. 10 (citing *Colorado River, supra* ). Ordinarily, however, the simple existence of parallel state proceedings is *not* a reason to abstain. There is no special circumstance here, such as a special federal statutory policy favoring a single forum, as there was in *Colorado River,* 424 U.S. at 817–21, 96 S.Ct. at 1246–48. Nor does it seem somehow especially convenient to have all matters tried in the state forum. *Id. See Moses H. Cone,* 460 U.S. at 15–16, 103 S.Ct. at 936–37. To the contrary, the complaints in the state proceedings contained in the record indicate that the few issues they raise similar to those raised in this case are embedded in a host of other, fact-specific claims related to a particular regulatory agency decision about costs. We cannot know when, or whether, the state courts in the state cases would reach, *e.g.,* the Medicare Supremacy Clause issue. The district court also referred to the possibility that the state legislature may amend the state law. But, as far as we are aware, no court has held that the possibility of future legislative action is a ground for abstention.

We conclude that abstention in respect to the first two sets of claims discussed in part 1B is not legally permitted.

B

As we previously pointed out (*see* p. 1012 *supra* ), the Hospitals, in their federal complaint, attacked two other aspects of Maine's law, one having to do with gifts to a hospital and the other with new hospital investment. Though the briefs do not explain the nature of these claims in much detail, on the basis of what we have learned from the record, we conclude that the district court may, with respect to these two issues, abstain, if it still wishes to do so.

■ The Hospitals attack the Maine statute's requirement that the Commission treat certain "donor restricted gifts" as "available resources" ("AR") used to reduce the amount of revenue the Hospitals can obtain through patient charges. § 396–E(1)(D). The Hospitals' complaint says that the statutory provision "confiscate[s]" their property and violates a contract between them and the donors. U.S. Const. Art. I, § 10, amend. XIV. The statute, however, says that the Commission will count gifts as "available resources" *"only to the extent these funds are applied to the use for which they were donated."* § 396–E(1)(D). Several of the complaints in the state cases (brought by some of the same hospital plaintiffs) suggest that the Hospitals, in fact, quarrel with an assumption the Commission has

made in applying the statute, namely that gifts for a particular purpose in the base year will continue to be used for that purpose in future years. If that is their quarrel, *Pullman*-type abstention may be appropriate to obtain an authoritative interpretation of the Maine statute, in respect to whether, or the extent to which, it permits such an interpretation. *See also,* Me.Rev. Stat.Ann. tit. 4, § 57 (Supp.1987); Me.R. Civ.P. 76B; *Gagne v. Carl Bauer Schraubenfabrick,* 595 F.Supp. 1081, 1088 (D.Me. 1984) (permitting certification of state law questions to the Maine Supreme Judicial Court).

■ Similarly, the district court may decide to abstain from deciding the Hospitals' "certificate of need" challenge. Plaintiffs do not directly attack the lawfulness of a certificate of need as a condition for new investment. Rather, they seem to attack the Commission's practice of deferring *some* projects for which it has issued a "certificate of need" in circumstances where permitting all to go forward would lead to state expenditures that exceed a global state expenditure "cap." In particular, they argue that the Commission "lacks standards" for deciding which of several authorized projects it should defer; they say that, for this reason, "deferral" violates the "due process" and "equal protection" clauses of the federal Constitution. U.S. Const. amend. XIV. *Pullman* -type abstention (or certification) may be appropriate in respect to this claim because these same plaintiffs are making identical claims in two state court suits, and the state courts may resolve the claims in ways that would moot, or significantly affect, the claims plaintiffs make here, on a state law theory. The state courts might, for example, read state law as importing a set of standards, the most obvious being those very standards used to decide whether to grant a "certificate of need" in the first place. *See* § 396–K(2), K(3).

The district court is not *required* to abstain in respect to these claims. We simply hold, in respect to these other issues, that it is up to the district court, with the case in its new posture, to decide whether to resolve these other issues on the merits, or

to certify relevant questions of state law, or to abstain.

## III

### *Remaining Issues*

In a cross-appeal, the Commission and the Department challenge the district court's finding that the Hospitals have standing to bring the claim in the complaint challenging the statute on Supremacy Clause grounds. This question is not properly before us, however, because the district court's holding on this question (denying the Commission and the Department's motion to dismiss) is not a "final order" subject to interlocutory appellate review under 28 U.S.C. § 1291 (1982). *Catlin v. United States,* 324 U.S. 229, 236, 65 S.Ct. 631, 635, 89 L.Ed. 911 (1945); *In re Empresas Noroeste, Inc.,* 806 F.2d 315, 317 (1st Cir.1986). Our resolution of the "abstention" question, which is a "final order," at this time, does not create an exception to this rule. *See Bonitz v. Fair,* 804 F.2d 164, 173 (1st Cir.1986).

*As to the appeal of Bath Memorial Hospital, No. 87–2103, the judgment is vacated and the case is remanded for proceedings consistent with this opinion. As to the cross-appeal by Maine Health Care Finance Commission, et al, No. 88–1168, the appeal is dismissed as this court does not have jurisdiction.*