**In re Application of Adolf HÖRLER to take the testimony of certain persons for use in a probate proceeding pending in Oberengadin, Switzerland, pursuant to 28 U.S.C. § 1782.**

No. M19–84.

United States District Court, S.D. New York.

July 7, 1992.

---

William Schurtman, New York City, for applicant.

Fred I. Sonnenfeld, Tammy Bigelow, Sullivan & Cromwell, New York City, for respondent.

Julius Kaplan, Washington, D.C., for intervenor Francesca Agusta.

## MEMORANDUM & ORDER

BRIEANT, Chief Judge.

By motion fully submitted on April 21, 1992, applicant Adolf Hörler moves to compel two New York attorneys to produce certain documents in connection with a foreign probate proceeding. The Court will briefly summarize the tangled history of this litigation, which, the reader is warned, in some respects resembles the plot of a "Dynasty" episode; in others, regrettably, it recalls the infamous case of *Jarndyce v. Jarndyce*, first reported in the pages of Charles Dickens' *Bleak House*.

On June 14, 1989, Count Corrado Agusta died at the age of sixty-five. From 1971 to 1983, the Count had served as chairman of Gruppa Agusta, a successful helicopter construction company started by his grandfather. At the time of his death, the Count was an Italian citizen domiciled in St. Moritz, Switzerland. The Count was survived by his second wife, Countess Francesca Vacca Agusta–Grafagni, from whom he had received a separation decree in Italy in 1985, and by his son by his first marriage, Riccardo Agusta. Countess Agusta is also a citizen of Italy, but resides in Mexico, while Riccardo Agusta is an Italian citizen currently residing in Monte Carlo.

The Count's last Will and Testament, executed on November 11, 1988, appoints Dr. Hans Jurgi Zinsli of St. Moritz as executor of his estate, and specifically recites that it is subject to Swiss law. The Will bequeaths the Count's entire estate to his

son, Riccardo Agusta. The state of relations between the Count and his estranged second wife can be gathered from the second paragraph of that instrument:

"I also dispose that my wife, FRANCESCA VACCA AGUSTA–GRAFAGNI, born October 29th, 1942, Italian citizen, resident in Mexico, and from whom I am legally separated, be disinherited in the event that at the time of my death, she be my heir.

This disinheritance is motivated by the fact that the said person named above has circulated numerous defamatory and slanderous statements about me, particularly in Italy, in Switzerland and in the United States of America and that she is looking for and threatening new ways to harass me and cause me prejudice with a view to collecting monies that are not due to her". Ex. 1 to April 21 Sonnenfeld Affidavit.

The Count and Countess were, apparently, no strangers to the courtroom. Before the Count's death, the Countess had sued in Supreme Court, New York County, in 1988 to impress a trust on a Fifth Avenue apartment owned by a Panamanian corporation allegedly controlled by the Count. The Court infers from counsel's statement at the argument of this motion that this litigation was resolved in the Count's favor; the Countess has apparently appealed, but that appeal has been automatically stayed due to the Count's death, and failure to appoint a representative to defend for his estate. *See* April 21 Tr. at 19.

Not surprisingly, the Count's death and the appearance of this Will escalated the family dispute to a new level—to the detriment of the dockets of at least nine courts in six nations. The Countess first elected to contest the Will in Italy; she avers that Italian law grants her some interest in the Estate of her deceased husband, irrespective of the decedent's wishes, and similar, perhaps, to an elective share in New York. Riccardo Agusta claims, by contrast, that the 1985 Italian separation decree extinguishes any rights the Countess may have had in the Count's Estate. The current status of this litigation is unclear.

The Countess has also contested the Will in Switzerland, where it has apparently been offered for probate. Counsel were unable entirely to clarify how a Will could be offered for probate in one country while it is being "contested" in another, but inform the Court that there is a treaty between Switzerland and Italy permitting this procedure.

In any event, the Countess also moved successfully in the Swiss probate court to suspend Dr. Zinsli as executor. Although this suspension seems to have been reversed, on July 20, 1989, Judge Lazzarini of the Probate Court of Oberengadin, Switzerland ("Kreisamt Oberengadin") appointed the applicant, Mr. Adolf Hörler, to inventory the assets of the Count's estate. Mr. Hörler is an attorney and Notary in St. Moritz. Mr. Hörler's attorneys describe his role as follows:

"Under Swiss law, a Notary who is appointed to inventory the assets of an estate has the right and duty to locate and collect such assets on a worldwide basis and must file a report with the Probate Court which appointed him". November 1 Schurtman Declaration at ¶ 4.

Mr. Hörler was subsequently appointed by the same court, on August 23, 1989, as the Official Administrator of the Estate. November 1 Schurtman Declaration at ¶ 5. That designation, of course, has been appealed in the Swiss courts by Riccardo Agusta, and the resolution of this appeal appears nowhere in the record.

To complete the description of what might be termed the eastern front of this litigation, the Swiss courts have, on the Countess' application, sealed access to the Count's villa in Switzerland, and the French and German courts have restrained the movement of the Count's airplane.

The first—but, as will appear, by no means the last—proceeding in the United States relating to the Count's Estate was instituted in the Surrogate's Court of New York County on July 31, 1989. In that proceeding, which is still pending and remains undecided, Countess Agusta sought the appointment of Citibank, N.A., as Tem-

porary Administrator of the Estate, pursuant to New York Surrogate's Court Procedure Act § 901 (McKinney Supp.1992). This statute essentially permits a potential beneficiary of an estate to petition for the appointment of a disinterested party to locate and preserve the assets of an estate pending probate. N.Y.Surr.Cts.Proc. § 902(7) (McKinney 1992). Just such a temporary administrator has already been appointed in the Bahamas.

After the filing of the Surrogate's Court action, Countess Agusta sought discovery in that proceeding of *inter alia* Mr. Herbert Grossman, since deceased. Mr. Grossman was a New York attorney who served as an advisor to Count Agusta, and who was instrumental in establishing and maintaining certain Panamanian, Bahamian, Cayman Islands and Netherlands Antilles corporations and partnerships. These entities were allegedly controlled by, or related to, the Count. Both Riccardo Agusta and Mr. Grossman moved to quash the subpoenas and notices of depositions. In an opinion dated October 6, 1989, Surrogate Lambert granted the Countess discovery of Mr. Grossman, reasoning that that court had the power to determine whether the Estate contained New York-based assets, and thus whether the Surrogate's Court could properly appoint a Temporary Administrator.[1]

In a subsequent opinion dated January 24, 1990, Surrogate Lambert also permitted the Countess to depose the Countess' stepson, Riccardo Agusta. Upon the inevitable appeal, this order was reversed by the Appellate Division, on the grounds that Riccardo Agusta, who is a citizen of Monaco, could only be deposed using the procedures set forth in the Hague Convention. *Matter of Agusta*, 171 A.D.2d 595, 567 N.Y.S.2d 664 (1st Dep't 1991). Though it appears that certain restraining orders have been entered with respect to entities which may be controlled, or have some connection with, the Count's Estate, as of this date no final determination regarding the appoint-ment of a Temporary Administrator has been reached by the Surrogate's Court.

Mr. Hörler, in the meantime, has been engaged in a parallel investigation with respect to the Count's assets. On February 14, 1991, Mr. Hörler filed an application in this Court for judicial assistance, pursuant to 28 U.S.C. § 1782(a). This statute provides that "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a) (West 1966). Mr. Hörler presumably sought the assistance of the federal courts because persons with interests in, or knowledge of, the location of the Estate's assets in the Americas had refused to cooperate with his investigation, which relates to a proceeding in a foreign tribunal, that is, the Probate Court of Oberengadin, Switzerland.

On February 15, 1991, Judge Sprizzo of this Court, presiding in Part I of this Court, issued an *ex parte* order allowing Mr. Hörler to take the depositions of certain witnesses. Of particular importance to this motion is that portion of Judge Sprizzo's Order granting the applicant the right to depose Ms. Gloria Neuwirth and the law firm of Sonnenfeld & Richman. Ms. Neuwirth, who is an attorney, became involved in this matter because Mr. Grossman, the Count's New York attorney and adviser, died in September 1990. Ms. Neuwirth apparently worked with Mr. Grossman, and currently represents the executors of his estate. Likewise, the law firm of Sonnenfeld & Richman worked with Mr. Grossman on some matters relating to Count Agusta, including, significantly, the defense of both the Supreme Court and Surrogate's Court actions.

Both Ms. Neuwirth and Sonnenfeld & Richman then moved to quash the subpoenas, arguing *inter alia* that Mr. Hörler was not an "interested person" within the

---

1. Of course, the very fact that Citibank is apparently willing to accept such an appointment supports an inference that the Estate does indeed contain New York-based assets. What ra-tional person, or institution, would consent to such an appointment knowing that there are no assets to administer?

meaning of the statute and that the probate proceeding in Oberengadin did not qualify as a "foreign tribunal". By endorsement Order dated May 30, 1991, Judge Lasker, presiding in Part I, denied the motion to quash, but "without prejudice to the moving party's right to make objections to the subpoenas if they are considered to be overbroad or otherwise deficient". Ex. 4 to November 14 Schurtman Declaration. Both Ms. Neuwirth and Mr. Fred I. Sonnenfeld, Esq., who was produced as the representative of Sonnenfeld & Richman, made such objections. It is these objections that give rise to this motion.

In the interest of completeness, the Court also notes that Judge Sporkin of the United States District Court for the District of Columbia, by order dated January 10, 1992, permitted Countess Agusta to intervene, pursuant to Fed.R.Civ.P. 24(a), and to attend depositions then being conducted by Mr. Hörler in the District of Columbia. Ex. 2 to February 7 Kaplan Affidavit. After this decision, Mr. Hörler apparently acceded to the Countess' requests to allow her to intervene also in this branch of the litigation.

This motion was adjourned for a period from November to April, and during that time counsel were able to resolve many of the specific discovery disputes that necessitated the motion. Remaining for decision, though, are two issues. First, Mr. Hörler seeks from Ms. Neuwirth information relating to Alamar, N.V., a Netherlands Antilles corporation for which Mr. Grossman performed services. Mr. Hörler suspects that this entity has or had some connection with Count Agusta, in part because some of Mr. Grossman's correspondence with third parties relating to this company mentions another company, Dirce, N.V., which concededly was connected to the Count.

At her deposition, Ms. Neuwirth refused to answer any questions relating to Alamar, on the grounds of attorney-client privilege. She has also refused to turn over to Mr. Hörler certain files relating to Alamar, and will likewise not disclose that corporation's principal. Ms. Neuwirth avers that the principal of Alamar adamantly refuses to have his identity revealed, and also has submitted a sworn affidavit stating that her own investigation of the matter has disclosed no relation between Alamar and Count Agusta. March 25 Neuwirth Affidavit at ¶ 5.

Second, Mr. Sonnenfeld has refused to produce some 800 documents from Mr. Grossman's files. These files, it is claimed, relate to Mr. Grossman's legal representation of both Count Agusta and Riccardo Agusta,[2] and are being withheld on grounds of attorney-client privilege and work product privilege. Mr. Hörler is seeking these documents because they may disclose the location of assets of the Estate. The parties have agreed to submit copies of these documents for *in camera* inspection by the Court.

While the Court would ordinarily undertake to resolve these discovery disputes, the Court must first question, on its own motion, whether it may properly resolve this matter. A federal court is of course compelled to consider its subject matter jurisdiction whether or not the issue is raised by the parties. *E.g., Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939). Though the doctrine

---

**2.** While this Court intends no criticism of the attorneys in this matter, one of the factors complicating this litigation is determining which lawyers and/or law firms are representing which client. Mr. Sonnenfeld, for example, characterized his representation(s) at the hearing on this motion as follows:

"Mr. Sonnenfeld: I am Fred I. Sonnenfeld, Sonnenfeld & Richman, and I represent Gloria Neuwirth and the estate of Herbert Grossman and Reton, Inc., and also myself, your Honor, in this to a degree. I do have counsel, Sullivan & Cromwell".

It also appears that Mr. Sonnenfeld and Sullivan & Cromwell likewise represent Riccardo Agusta. However, it was the late Mr. Grossman who truly cornered the market on the legal needs of the Agusta family, at least in this country: at various times he represented Count Agusta, various corporations allegedly controlled by Count Agusta, Riccardo Agusta and Countess Francesca Agusta. *See* April 16 Schurtman declaration at ¶ 20.

of abstention is not, strictly speaking, jurisdictional, *Winston v. Children and Youth Services*, 948 F.2d 1380, 1385 (3d Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 2303, 119 L.Ed.2d 225 (1992), a District Court also may properly consider whether, in the exercise of its equitable discretion, abstention may be appropriate on the facts of a particular case. *Luckey v. Harris*, 896 F.2d 479, 481 (11th Cir.1989) (Edmonson, J., dissenting from denial of rehearing en banc) (permissible to raise abstention on court's own motion since abstention more than a "pleader's option") (quoting *Zwickler v. Koota*, 389 U.S. 241, 257, 88 S.Ct. 391, 400, 19 L.Ed.2d 444 (1967) (Harlan, J., concurring)), *cert. denied*, 495 U.S. 957, 110 S.Ct. 2562, 109 L.Ed.2d 744 (1990); *RR Village Association, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1206–07 (2d Cir.1987) (Van Graafeiland, J., dissenting) (same); *United Home Rentals, Inc. v. Texas Real Estate Commission*, 716 F.2d 324, 332 (5th Cir.1983) (same), *cert. denied*, 466 U.S. 928, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984). Of course, the case for *sua sponte* consideration of abstention is significantly stronger where, as here, there are so many related proceedings filed prior in time and pending in state (or foreign) courts, and where federal decision of an issue may interfere—or even conflict with—the work of those tribunals. *Cf. Luckey, supra* at 481 (Edmonson, J., dissenting from denial of rehearing en banc) (discussing federalism concerns underlying abstention).

Although there are different categories of abstention, *De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir.1989) (enumerating types of abstention), the Court believes that the so-called *Colorado River* branch of abstention[3] is most pertinent here. In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court articulated an "exceptional circumstances" exception to the exercise of federal court jurisdiction. *Id.* at 818, 96 S.Ct. at 1247. Although, the Court stated, federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them", *id.* at 817, 96 S.Ct. at 1246, they may properly decline to do so in light of this exception, which "rests on considerations of '[wise] judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation' ". *Id.* (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952)). *See also Bath Memorial Hospital v. Maine Health Care Finance Commission*, 853 F.2d 1007, 1013 (1st Cir.1988).

■ The current test for whether *Colorado River* abstention is appropriate involves the application of six factors:

"(1) assumption of jurisdiction over a *res;* (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights". *De Cisneros, supra* at 307.

In applying these factors, a court is directed to engage in a "careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction". *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983). Of course, the relative weight to be ascribed to each of these factors may vary in a particular case, *e.g.*, *Arkwright–Boston Manufacturers Mutual Insurance Co. v. City of New York*, 762 F.2d 205, 211 (2d Cir.1985) (danger of piecemeal litigation overriding factor justifying abstention), and the analysis of these factors is committed to the sound discretion of the District Court. *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 665–666, 98 S.Ct. 2552, 2558–2559, 57 L.Ed.2d 504 (1978).

■ The first factor, the assumption of jurisdiction over a *res,* is not directly present in this case. This action is not brought *in rem*, but rather pursuant to a federal

---

**3.** There is some scholarly controversy as to whether the refusal to decide a controversy on *Colorado River* grounds is technically a form of "abstention". *See* 17 Wright, Miller & Cooper *Federal Practice & Procedure* § 4247 at 150–51 (West 1988).

statute which authorizes federal court assistance to persons involved in foreign judicial proceedings. However, if the Surrogate's Court of New York County does appoint a Temporary Administrator, that person *will* assume temporary control over assets of the Count's Estate. Furthermore, as the Surrogate's opinion of January 8, 1991, makes clear, there are presently restraining orders in effect with respect to certain entities allegedly controlled by the Count. On balance, then, this factor may be said to favor abstention. *Cf. Lawrence v. Cohn,* 778 F.Supp. 678, 685 (S.D.N.Y.1991) (Surrogate's Court assumption of jurisdiction over estate supported *Colorado River* abstention).

The second factor, the inconvenience of the forum, is of no effect, as the Surrogate's Court is only one street removed from federal court in Manhattan.

■ As in *Arkwright, supra,* it is the third factor, the danger of piecemeal litigation, that weighs most heavily in favor of abstention. The fact is that many of the issues originally presented to this Court for resolution have been, or are being, litigated in the Surrogate's Court. In that litigation, Countess Francesca Agusta is seeking the appointment of a Temporary Administrator; to be successful, she must demonstrate that there are New York-based assets of the Estate, or that the Estate's creditors need protection. More broadly, of course, it is in the Countess' interest to maximize the value of the Estate, in the hope that she will eventually be granted a share of the Estate. Thus, as her attorneys aver in their original motion to intervene in this proceeding:

> "Countess Agusta's lawyers have for *a period of in excess of 2½ years* been involved *worldwide* in the search for estate assets and have thereby gained extensive knowledge about the estate. By contrast, counsel for Notary Hörler have been involved exclusively in this country and for a much more limited period of time. Thus, although Notary Hörler's objectives in taking depositions here are not dissimilar to those of Countess Agusta, the background and knowledge of

Countess Agusta's attorneys would permit much broader and more effective discovery. *In fact, it is from information obtained by Countess Agusta's attorneys that the persons and entities to be deposed were identified "*. Kaplan Affidavit at ¶ 2 (emphasis in original).

Furthermore, in the event that a Temporary Administrator *is* appointed in New York, that person will presumably also be seeking discovery of Mr. Grossman's personal representative, in order to locate and secure Count Agusta's assets. The Surrogate's Court should not, in such an event, be confronted with possible issue preclusion with respect to which documents are or are not privileged. There is a real risk that this Court's ruling and the Surrogate's Court ruling on such matters might be inconsistent. That court would be applying the New York law of attorney-client privilege, while this Court, guided by Federal Rule of Evidence 501, would likely apply the federal common law attorney-client privilege, *see infra.* Such a likelihood of inconsistent decisions is a critical element justifying *Colorado River* abstention. *De Cisneros, supra* at 308 (possibility of "contradictory determinations" factor justifying abstention); *Arkwright, supra* at 211 (same); *Bull & Bear Group, Inc. v. Fuller,* 786 F.Supp. 388, 392–93 (S.D.N.Y.1992) ("existence of parallel actions posing the threat of inconsistent results" factor justifying abstention). *See also Arizona v. San Carlos Apache Tribe of Arizona,* 463 U.S. 545, 567, 103 S.Ct. 3201, 3213, 77 L.Ed.2d 837 (1983) ("[T]he existence of such concurrent proceedings creates the serious potential for spawning an unseemly and destructive race to the courthouse to see which forum can resolve the same issues first ...").

Finally, the Surrogate's Court is better situated to resolve these claims of privilege than is this Court. Mr. Sonnenfeld, the attorney interposing the privilege claim, has stated that a portion of the 800 documents submitted for *in camera* review are work product documents relating to *the Surrogate's Court litigation itself:*

"Many of the withheld documents are Mr. Grossman's work product drafts of affidavits and memoranda of law which Mr. Grossman worked upon in two different litigations, namely, the action instituted by Francesca Agusta in Supreme Court, New York County, against Corrado Agusta in 1988 to impress a trust upon the apartment at Olympic Towers, which she now contends is owned by the decedent's estate, and *the litigation commenced by Francesca Agusta in the Surrogate's Court, New York County, for the appointment of a temporary administrator*". April 21 Sonnenfeld Affidavit at ¶ 6 (emphasis added).

It can hardly be doubted that the court in which the underlying litigation is pending is better placed to analyze claims of privilege than this Court, which is a relative stranger to the case for which the allegedly privileged documents were generated.

To be sure, Mr. Hörler is not currently a party to the Surrogate's Court action; he has invoked a federal statute which permits a federal District court, in its discretion, to use its powers to aid persons involved in a foreign judicial proceeding. 28 U.S.C. § 1782 (West 1966) ("The district court ... *may* order him to give his testimony ..."); *Lo Ka Chun v. Lo To*, 858 F.2d 1564 (11th Cir.1988) (district court has the discretion to determine whether to honor request for assistance); *In re Letters Rogatory from Tokyo District Court*, 539 F.2d 1216, 1219 (9th Cir.1976) (same). Yet the fact remains that he, the Temporary Administrator in the Bahamas, the Countess and, if one is appointed, the Temporary Administrator in New York, are at this point united in interest: all are seeking to locate and preserve the Estate's assets. It serves absolutely no purpose for every interested party to engage in his or her own parallel discovery expedition.

■ The fourth factor in the abstention inquiry is the order in which the actions were filed. This, too, favors abstention, as the Surrogate's Court action was filed in July 1989, while this special proceeding was filed in February 1991. Furthermore, as previously indicated, there has already been extensive litigation in that action, including prolonged discovery by the parties and the issuance of restraining orders by the Surrogate. *See Arkwright, supra* at 211 (relative progress of two actions relevant consideration in assessing weight to be ascribed to this factor). *See also Bull & Bear, supra* at 393 ("... the fact that the instant case is related to more than one state court action militates in favor of abstention").

■ The application of the fifth factor—which law provides the rule of decision—is somewhat problematic on the facts of this case, since there is no underlying "claim" to be adjudicated. *Cf. De Cisneros, supra* at 308 ("When the underlying *substantive* law is federal, abstention is disfavored, though the inverse proposition will not alone support a surrender of federal jurisdiction") (emphasis added). Thus, although the Court has federal statutory jurisdiction, the only issue of "federal law" in the case is the application of the federal common law of attorney-client and work product privilege to Mr. Sonnenfeld's claims. Fed. R.Evid. 501; *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987) (applying federal common law privilege). As Mr. Hörler is therefore not seeking to vindicate any substantive rights granted him by federal law, the case for abstention notwithstanding the presence of federal statutory jurisdiction is strengthened. *Cf. Moses H. Cone, supra*, 460 U.S. at 23–26, 103 S.Ct. at 941–942 (important federal substantive policies underlying claim counselled against abstention).

■ On the issue of privilege, this Court would likely look to Proposed Federal Rule of Evidence 503 [4], which stated that "The privilege may be claimed by ... the personal representative of a deceased client ...". *Cf. In re Request for Judicial Assistance*, 669 F.Supp. 403, 407 (S.D.Fla.1987) (applying federal law on motions to vacate or

---

**4.** Courts frequently look to the Proposed Rules of Evidence as a source of federal common law. *United States v. Spector*, 793 F.2d 932, 938 (8th Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

quash discovery orders issued pursuant to § 1782). Even granting that this is a correct statement of federal law, identifying the "personal representative" of Count Agusta is less than simple: Mr. Hörler claims that, as official administrator of the Estate, he has succeeded to the privilege, which, of course, he desires to waive. Mr. Sonnenfeld, representing the estate of Mr. Grossman, the Count's former attorney, disputes this assertion, contending that only Dr. Zinsli, the suspended Swiss executor of the will, could waive the privilege. New York law, on which the parties here relied in briefing this issue, is likewise unclear on this point. The New York statute codifying the attorney-client privilege is silent on this issue, *see* N.Y.Civ.Prac.L. & R. § 4503 (McKinney 1966 & 1992 Supp.), and there is some conflict in the cases. *Compare Matter of Fishman*, 32 A.D.2d 1063, 1064, 303 N.Y.S.2d 905, 907 (2d Dep't 1969) (Hopkins, J., concurring) (executor may waive privilege), *aff'd*, 27 N.Y.2d 809, 264 N.E.2d 356, 315 N.Y.S.2d 866 (1970) *with Matter of Alexander*, 205 Misc. 894, 895, 130 N.Y.S.2d 648, 650 (Surr.Ct.Suffolk Co. 1954) (power to waive privilege terminated by death of client) and *Matter of Williams*, 179 Misc. 805, 808–09, 39 N.Y.S.2d 741, 746 (Surr.Ct.N.Y.Co.1942) (same). *See also Matter of Beiny*, 129 A.D.2d 126, 135, 517 N.Y.S.2d 474, 479 (1st Dep't 1987) ("While it is questionable whether even a duly appointed executor would have had the power to waive the decedent's attorney-client privilege ... it is quite certain that one merely named as an executor in an unprobated will would have had no authority whatsoever to do so") (citations omitted). Since this precise question arises, for obvious reasons, most frequently in the state court system, this Court believes that the Surrogate's Court should address it in the first instance.

■ The sixth and last *Colorado River* factor is whether the federal plaintiff's rights will be adequately protected in the state forum. As noted above, Mr. Hörler is not presently a party to the state action, so this factor would seem initially to weigh against abstention. *But see Cannady v. Valentin*, 768 F.2d 501, 503 (2d Cir.1985)

(*Colorado River* abstention permissible despite lack of identity between federal and state plaintiffs). However, Mr. Hörler is seeking only the production of certain documents relating to the decedent's estate, and is acting only as a fiduciary for the estate. If the Surrogate's Court determines that a Temporary Administrator should be appointed, that person will have an identity of interest with Mr. Hörler.

■ Finally, our decision to abstain on *Colorado River* grounds is influenced, in part, by the special expertise of the Surrogate's Court in matters related to the probate and administration of wills. Although this case may not fall within the so-called "probate exception" to federal court jurisdiction, since jurisdiction is invoked pursuant to a federal statute rather than diversity of citizenship, *Ashton v. Josephine Bay & C. Michael Paul Foundation*, 918 F.2d 1065, 1071–72 (2d Cir.1990) (holding case for exercise of federal jurisdiction stronger in interpleader action than in diversity action), abstention is particularly appropriate in cases whose resolution may interfere with ongoing probate proceedings. *Ashton, supra* at 1071 ("... a federal court may not probate a will, administer an estate, or *entertain an action that would interfere with pending probate proceedings in a state court* ...") (emphasis added); *Bassler v. Arrowood*, 500 F.2d 138, 142 (8th Cir.1974) ("The area of probate and decedents' estates presents many varied problems. State courts deal with these problems daily and have developed an expertise which should discourage federal court intervention. These local problems should be decided by state courts"), *cert. denied sub nom. Lee v. Arrowood*, 419 U.S. 1116, 95 S.Ct. 796, 42 L.Ed.2d 815 (1975); *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509, 516 (2d Cir.1973) ("There is particularly strong reason for abstention in cases, which, though not within the exception for matters of probate and administration or matrimony and custody actions, are on the verge ..."); *Reichman v. Pittsburgh National Bank*, 465 F.2d 16, 18 (3d Cir.1972) ("special ability" of state courts to decide trusts

and estate issues justified abstention). *But cf. Giardina v. Fontana,* 733 F.2d 1047, 1053 (2d Cir.1984) (party urging application of probate exception in federal court had previously contended in Florida probate court that probate court lacked jurisdiction).

For all these reasons, this special proceeding is hereby dismissed without prejudice, in order that the issues presented may be resolved in the Surrogate's Court of New York County when and if a Temporary Administrator is appointed.

SO ORDERED.