**ST. MICHAEL HOSPITAL OF FRAN-CISCAN SISTERS, MILWAUKEE, INC., Plaintiff,**

v.

**Tommy THOMPSON, Patricia Goodrich, George Mackenzie, and Christine Nye, Defendants.**

No. 89–C–0620–C.

United States District Court, W.D. Wisconsin.

Oct. 25, 1989.

On Motion for Reconsideration Nov. 21, 1989.

Ronald E. Mohorek, Vonbriesen & Purtell, S.C., Milwaukee, Wis., for plaintiff.

Gerald S. Wilcox, Asst. Atty. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief. Plaintiff contends that defendants have improperly administered the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, through their application of an inadequate reimbursement rate and implementation of an insufficient appeals process, in violation of the supremacy clause and the Fourteenth Amendment's due process clause. Jurisdiction is alleged to exist under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

The Medicaid Act distributes federal funding to participating states for the purpose of providing medical services to certain categories of needy people. States wishing to participate in the program must develop a state plan which meets certain minimum qualifications found at 42 U.S.C. § 1396a(a). One of these is that the reimbursement rates for services performed by provider hospitals be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A). Another is that the state agency in charge of administering the state's Medicaid program must establish an appeals mechanism that allows providers to submit additional evidence and receive prompt administrative review on reimbursement issues which the agency considers relevant. 42 C.F.R. § 447.253(c).

Wisconsin's State Plan has been developed, amended, and administered by the Wisconsin Department of Health and Social Services (DHSS) pursuant to Wis.Stats. § 49.45. Effective July 1, 1987, the State amended its plan, affecting the reimbursement rates for hospitals. Plaintiff filed this suit challenging the calculation of its new reimbursement rate and the appeals process implemented by DHSS. Since filing this action, plaintiff has been granted a hearing by DHSS pursuant to Wis.Stats. § 227.42 and Wis.Admin.Code § HSS 106.-10, but has not yet received a decision.

Presently before the court is defendants' motion to dismiss on the ground that the Medicaid Act does not provide a private right of action or, in the alternative, on the ground that this court should abstain from disturbing the state administrative procedures enacted in accordance with the Medicaid Act. For the reasons that follow, I conclude that the Medicaid Act does allow for private rights of action. However, in light of the predominantly local factors involved in plaintiff's complaint, the existence of a state administrative board designed to handle such complaints, and the pendency of plaintiff's state administrative hearing, I also conclude that this court should abstain from disturbing the state review system by virtue of the *Burford* abstention doctrine.

For the purpose only of deciding this motion, I take as true the following findings of fact from the allegations of the complaint.

## FACTS

Plaintiff St. Michael Hospital is a nonprofit, nonstock, corporation duly organized and existing under the laws of the State of Wisconsin. It is licensed to render medical services as a hospital by the State of Wisconsin and is authorized by the State as a provider of medical services to Medicaid recipients.

Defendant Tommy Thompson is Governor of the State of Wisconsin, and is responsible for administering and implementing Wisconsin's Medicaid program, including the periodic approval of amendments to Wisconsin's state plan for reimbursement to hospitals rendering inpatient services to Medicaid recipients.

Defendant Patricia Goodrich is Secretary of the Department of Health and Social Services. She is responsible for directing the actions of the department's various agents who amend, interpret, administer, and apply Wisconsin's state plan.

Defendant George MacKenzie is the administrator of the Division of Health, the division within DHSS responsible for the administration of Wisconsin's Medicaid program. Defendant MacKenzie supervises the day-to-day administration of Wisconsin's state plan for medical assistance.

Defendant Christine Nye is the director of the Bureau of Health Care Financing, the bureau within the Division of Health that handles the day-to-day administration of Wisconsin's state plan. Defendant Nye is responsible for the administration of Wisconsin's state plan for medical assistance.

Medicaid is a cooperative federal-state program that furnishes medical care to certain categories of low-income and disabled persons pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* Although states are not required to participate in the Medicaid program, those that do must submit a state plan for medical assistance to the Health Care Financing Administration of the federal Department of Health and Human Services and receive approval of their state plan as a condition of receiving federal funds.

42 U.S.C. § 1396a(a)(13)(A) requires that state plans for medical assistance must reimburse hospitals at rates that are "reasonable and adequate" to meet the costs that must be incurred by "efficiently and economically" operated facilities in order to provide care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access to inpatient hospital services of adequate quality.

The federal Department of Health and Human Services has promulgated administrative regulations implementing these statutory Medicaid reimbursement requirements. The Department requires that "[t]he Medicaid agency [of the state] must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates." 42 C.F.R. § 447.253(c).

Wisconsin has elected to participate in the Medicaid program and has delegated the responsibility to defendants for administering the program.

Effective July 1, 1987, defendants amended Wisconsin's State Plan to provide for a new method of reimbursing provider hospitals. This amendment was submitted to the Health Care Financing Administration with the requisite assurances that the new plan satisfied federal law and regulations. The Health Care Financing Administration approved the amendment.

The amended plan provides that hospitals will be reimbursed at a fixed rate for each Medicaid patient they treat. In other words, for each Medicaid recipient that a provider hospital admits and subsequently discharges, that hospital receives a predetermined unit of reimbursement without regard to the particular patient's illness, the services rendered, the length of the patient's stay, or the hospital's overall case mix.

This fixed rate per discharge is calculated for each provider by determining the hospital's allowable costs associated with rendering services to Medicaid recipients in a base year, and, after adjusting for certain factors, dividing the allowable-costs figure by the total number of Medicaid recipients discharged from the hospital in the base year.

The base year used to calculate St. Michael Hospital's rate per discharge was July 1, 1985 through June 30, 1986 (1986 fiscal year). During this year, defendants maintained a "gatekeeper program" for Medicaid recipients who required mental health services or alcohol and other drug abuse treatment services. One of the objectives of the gatekeeper program was to utilize public facilities such as the Milwaukee County Mental Health Complex as much as possible.

St. Michael Hospital is located in Milwaukee County. During St. Michael Hospital's base year, almost all Milwaukee County Medicaid recipients with a nonemergency psychiatric diagnosis, ages 22 through 64 inclusive, were admitted to the Milwaukee County Mental Health Complex as a result of the gatekeeper program. As of July 1, 1986 (the first day following the end of St. Michael Hospital's base year), defendants eliminated the gatekeeper program, which

meant that St. Michael Hospital had to render services to a greater number of patients requiring mental health or alcohol and other drug abuse treatment.

This elimination of the gatekeeper program intersected with what is known as the "HMO initiative," a program implemented on January 1, 1985, in which DHSS required most Milwaukee County Medicaid recipients to enroll in a health maintenance organization. Health Maintenance Organizations received Medicaid reimbursement from defendants and, in turn, arranged through contract to have services rendered to their enrollees by health care providers. After January 1, 1985, health care providers, including St. Michael Hospital, received reimbursement for rendering services to Medicaid recipients enrolled in a Health Maintenance Organization through Health Maintenance Organization contracts and received no money directly from the State of Wisconsin for services rendered to these patients.

Certain categories of patients were exempted from the Health Maintenance Organization initiative: in particular, those individuals with more than two inpatient hospital stays of 16 days or longer for mental health or alcohol and other drug abuse treatments. As a result of the elimination of the gatekeeper program and implementation of the Health Maintenance Organization initiative, beginning in the year after St. Michael Hospital's base year, the percentage of Medicaid patients whose services were paid for directly by the State of Wisconsin increased to approximately 33% of all such patients, causing St. Michael Hospital's case mix for fiscal years 1987 and beyond to differ markedly from the case mix for its base year of fiscal 1986.

Wisconsin's state plan provides for challenges to a hospital's prospective reimbursement rate on account of case mix changes, but limits these challenges to changes arising out of "the implementation or cessation, after the base year, of the Medical Assistance Preferred Enrollment/HMO initiative." Subsequent to plaintiff's filing of this action, plaintiff was granted a hearing on the issue of the adequacy of its reimbursement rate.

## OPINION

Plaintiff's contention is that defendants have failed to provide it with a reimbursement rate that is "reasonable and adequate to meet the costs ... incurred by [an] efficiently and economically operated" hospital, in violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), and that the appeals process established by defendants is not capable of redressing this failure, thus constituting a violation of the federal regulations calling for such a procedure as well as of the due process clause of the Fourteenth Amendment.

Defendants contend that this court does not have jurisdiction to hear these claims under 28 U.S.C. § 1343 because the Medicaid Act does not provide for private rights of action. Alternatively, defendants argue that this court should abstain from interfering with the state's system of review. I will address these contentions separately.

### 1. Private Right of Action Under the Medicaid Act

In 1981, Congress amended the hospital reimbursement provisions of the federal Medicaid statute pursuant to the Boren Amendment of the Omnibus Budget Reconciliation Act. What resulted was 42 U.S.C. § 1396a(a)(13)(A), which, as mentioned above, requires participating states to reimburse hospitals at rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."

The Boren Amendment had two purposes: to allow the states to set their own reimbursement rates without cumbersome and expensive federal oversight of their methods and to encourage the reduction of Medicaid expenses by allowing the states to develop payment systems that would promote efficiency. *Colorado Health Care v. Colorado Dep't. of Social Services,* 842 F.2d 1158, 1165 (10th Cir.1988).

Despite this apparent congressional intent to insulate a state's calculations of its

reimbursement rates from federal oversight and individual challenge, the federal appellate courts that have encountered private challenges to reimbursement processes have inferred a private right of action under the Medicaid Act pursuant to 42 U.S.C. § 1983. *See Amisub (PSL), Inc. v. State of Colorado Dep't of Social Services,* 879 F.2d 789 (10th Cir.1989); *Virginia Hospital Association v. Baliles,* 868 F.2d 653 (4th Cir.1989); *Coos Bay Care Center v. State of Oregon, Dep't of Human Resources,* 803 F.2d 1060 (9th Cir.1986); *Nebraska Health Care Association, Inc. v. Dunning,* 778 F.2d 1291 (8th Cir.1985). As in these cases, the issue raised here is whether § 1396a(a)(13)(A) creates rights in favor of plaintiff that are enforceable under § 1983.

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the United States Supreme Court held that a federal statute may imply private rights enforceable against state officials under 42 U.S.C. § 1983. A year later, the Court "recognized two exceptions to the application of § 1983 to [federal] statutory violations." *Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981). These exceptions arise in cases in which (1) Congress has foreclosed private enforcement of the federal statute in the language of the statute itself, or (2) the statute is not the kind that creates enforceable "rights" under § 1983. *Id.,* citing *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). In *Pennhurst,* moreover, the Court made clear that the touchstone for both exceptions is congressional intent, as evinced in the language and legislative history of the statute.

In *Pennhurst,* the Court examined the text and legislative history of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.,* to determine whether the Act's "Bill of Rights" provision gave its beneficiaries a right of action against state officials. Like the Medicaid Act, the Developmentally Disabled Assistance Act was a federal-state program whereby the federal government provided funds to participating states to aid them in creating programs to care for the developmentally disabled. Also like the Medicaid Act, states choosing to participate in the program had to submit a state plan to the Secretary of the Department of Health and Human Services for approval before federal funds would be distributed.

In *Pennhurst* the statute provided that persons with developmental disabilities were entitled to "appropriate treatment" in the "least restrictive environment." 42 U.S.C. § 6010. The respondents contended that such language gave them enforceable rights against those state officials who failed to meet this standard of treatment. The Court disagreed. Examining the language and legislative history of § 6010, the Court concluded that Congress was not conditioning the distribution of funds on whether states were meeting this "least restrictive environment" standard, but was merely encouraging the states to provide better services to the developmentally disabled. *Pennhurst,* 451 U.S. at 20, 101 S.Ct. at 1541. Therefore, whether § 6010 generated enforceable private rights turned on the distinction between Congress's attempt to encourage better treatment and its imposition of absolute obligations on the states to meet certain treatment standards. *Id.* at 27, 101 S.Ct. at 1545. "When Congress intended to impose conditions on the grant of federal funds ... it proved capable of doing so in clear terms. Section 6010, in marked contrast, in no way suggests that the grant of federal funds is 'conditioned' on a State's funding the rights described therein." *Id.* at 23, 101 S.Ct. at 1543.

In *Pennhurst* the Court formulated the exceptions to the *Thiboutot* rule in explaining why the Developmentally Disabled Assistance Act did not imply a right of action: (1) the remedial scheme of the statute was sufficiently complete to evince a congressional intent to foreclose alternative remedies under § 1983, and (2) the language of the statute did not confer enforceable rights on the individual beneficiaries of the Act.

Neither of these exceptions apply to § 1396a(a)(13)(A) of the Medicaid Act. With respect to the first exception, although it is true that Title XIX requires federal approval of state plans and instructs states to establish administrative review procedures for rate disputes, the Act's scheme of review lacks the comprehensiveness that would imply a congressional intent to foreclose alternative remedies. *See Virginia Hospital Association,* 868 F.2d at 660–61; *Coos Bay Care Center,* 803 F.2d at 1062.

Notably, the Act does not mandate any formal judicial or federal administrative review of a participating state's actions. The Supreme Court has found the absence of such a review procedure a strong indication of congressional intent not to foreclose alternative remedies. *Wright v. Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 427, 107 S.Ct. 766, 772, 93 L.Ed.2d 781 (1987).

Moreover, the procedure whereby the Secretary of the Department of Health and Human Services approves a state's plan is overtly cursory. The regulations implementing § 1396a(a)(13)(A) provide that the Secretary's review should not involve the reasonableness of the rates that a state promulgates, but rather the adequacy of the "methods and standards used by the [state] to set payment rates ..." 42 C.F.R. § 447.252(b). In addition, these regulations provide that if the Secretary fails to notify a state regarding the Secretary's approval or disapproval of the state's plan within 90 days, the plan will be deemed to have been accepted. 42 C.F.R. § 447.256(b).[1]

Therefore, in light of the casual review procedures required by the Medicaid Act, I conclude that § 1396a(a)(13)(A) does not manifest a congressional intent to foreclose alternative methods of review.

The second *Pennhurst* exception focuses on the language of the statute to determine whether it evinces a congressional intent to bestow rights on the act's beneficiaries. Unlike the provision under consideration in *Pennhurst,* the language of § 1396a(a)(13)(A) exhibits a congressional demand, as opposed to a legislative suggestion. The statute states that "[a] State plan for medical assistance *must* provide for payment" of rates that are "reasonable and adequate." 42 U.S.C. § 1396a(a)(13)(A) (emphasis added). In light of *Pennhurst's* distinction between encouragement on the one hand and a binding obligation on the other, the language in § 1396a(a)(13)(A) comes closer to constituting the imposition of an affirmative duty as opposed to the mere recommendation of a target level for reimbursement rates.

■ Providers are beneficiaries of the Medicaid Act in so far as they have a direct financial interest in the rates that their respective states establish. *Coos Bay Care Center,* 803 F.2d at 1063. The text of § 1396a(a)(13)(A) reveals a congressional intent to provide participating hospitals with an enforceable right of action against the state officials responsible for the Act's administration.

Accordingly, I conclude that § 1396a(a)(13)(A) confers a private right of action on plaintiff through 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

*2. Abstention*

■ Defendants argue that this court should abstain from deciding plaintiff's claims on the grounds of either *Younger* or *Burford* or both. Because I conclude that *Burford* requires abstention, I will not reach the question whether *Younger* would mandate abstention also.

In *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Supreme Court declined to interfere with a

---

1. The legislative history of the Medicaid Act supports the inference that Congress did not intend the Secretary to make a thorough review of state plans. While pointing out that the Secretary would continue to insist on "assurances ... that the payment rates ... are reasonable and adequate," Congress "expect[ed] that the Secretary will keep regulatory and other requirements to that minimum necessary to assure proper accountability, and not ... overburden the States and facilities with marginal but massive paperwork requirements." S.Rep. 96–471, 96th Cong., 1st Sess. 29.

Texas Railroad Commission decision authorizing the drilling of oil wells. Plaintiffs had brought suit in federal court contending that the railroad commission had improperly applied Texas's complex oil and gas conservation regulations when granting the oil drilling permit, in violation of the Fourteenth Amendment. The Court determined that the complex state system for regulating the oil industry, involving both administrative decisionmaking and judicial review, had to be allowed to function without interference from the federal courts. As Justice Black wrote, "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy, are the inevitable product of this double system of review." *Id.* at 327, 63 S.Ct. at 1104.

The Court applied the same principles of comity in *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), in which it held that a federal court could not review a state regulatory commission's denial of a railroad's request to discontinue certain unprofitable passenger lines. Under Alabama law, a party dissatisfied with a final order of the commission could appeal to the Circuit Court of Montgomery County, which was "empowered to set aside any Commission order found to be contrary to the substantial weight of the evidence or erroneous as a matter of law." *Id.* at 348, 71 S.Ct. at 767. In light of this opportunity for state court review, the predominantly local factors involved, and the desire to avoid needless friction with the state courts, federal court abstention was deemed appropriate. "As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights." *Id.* at 349, 71 S.Ct. at 768.

The principles at work in *Burford* and *Alabama Public Service Commission* have come to be known as the *"Burford* doctrine." Recently, the Supreme Court summarized the elements of this doctrine.

Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service, Inc. v. New Orleans,* —— U.S. ——, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989), quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

In *New Orleans Public Service,* the Court held that *Burford* abstention did not apply to a utility's claim that the local ratemaking body (the Council) was prohibited by federal law from refusing to provide a rate increase ordered by the Federal Energy Regulatory Commission. According to the Court, abstention was not mandated in this situation because the utility's claim did not involve local factors or implicate state policy; rather, it simply raised the question whether the Council's actions were pre-empted by federal law. "[N]o inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is *facially pre-empted* by FERC's allocative decree and relevant provisions of the Federal Power Act." *Id.* 109 S.Ct. at 2515 (emphasis added).

Notably, the Court distinguished the utility's action from a suit that would invoke the *Burford* doctrine, which would include a "claim that a state agency ha[d] *misapplied its lawful authority* or ha[d] *failed to take into consideration* or properly weigh relevant state-law factors ..." *Id.* 109 S.Ct. at 2514–2515 (emphasis added).

Plaintiff's claims fall into this second category. Its primary complaint turns on the allegation that the state administrative body of the Medicaid Act, the Department of Health and Social Services, failed to

compute a fair reimbursement rate for plaintiff because it used a base year that did not adequately reflect plaintiff's current case mix. Therefore, according to plaintiff, the reimbursement rate violates the Medicaid Act, for it does not provide "reasonable and adequate" compensation. Plaintiff's claim incorporates both elements of the Supreme Court's description of a claim warranting *Burford* abstention: it involves defendants' misapplication of the authority granted to the state to calculate "adequate and reasonable" rates and explains this misapplication in terms of defendants' failure to take into account certain local factors.

Plaintiff argues that *Burford* abstention is inappropriate here for the same reasons that it was inappropriate in *Virginia Hospital Association,* 868 F.2d 653. However, that case is distinguishable from this one in a number of respects. In *Virginia Hospital Association,* the Court of Appeals for the Fourth Circuit held that *Burford* abstention did not apply to an action brought by a group of hospitals challenging the procedures used in Virginia's reimbursement plan. One of the reasons the Fourth Circuit declined to follow *Burford* was its reliance on the district court's finding that the plaintiff class "could not have prosecuted its claims through the administrative appeals apparatus [of the state]." 868 F.2d at 665. The court speculated that the state appeals process was not available to the plaintiff class because "the regulation [calling for a state appeals mechanism] appears not to authorize appeals by *class* representatives such as [plaintiff]." *Id.* at 661 n. 9 (emphasis added).

Indeed, the federal regulation that instructs participating states to establish an appeals mechanism calls for review of *individual* challenges concerning "such issues as the agency determines appropriate." 42 C.F.R. § 447.253(c). This poses no obstacle here. Plaintiff is an individual provider that is asking defendants to recalculate its reimbursement rate because of a change from its base year in its case mix. Defen-

dants will hear this appeal, but will consider only the change in plaintiff's case mix brought about by the implementation of the Health Maintenance Organization initiative, because that is the issue concerning case mix changes defendants consider worthy of appeal.[2] Moreover, plaintiff is challenging the use of certain data in defendants' calculation procedures, whereas the plaintiff class in *Virginia Hospital Association* was challenging the procedures themselves. Therefore, unlike the situation in *Virginia Hospital Association,* the appeals apparatus in place in Wisconsin is specially suited to consider plaintiff's grievances: plaintiff is bringing an individual challenge against defendants for using insufficient data in the calculation of its reimbursement rate and the state agency is empowered to recalculate this rate if the plaintiff raises discrepancies that the agency has determined warrant consideration.

However, plaintiff also contends that the scope of consideration of the appeals board is unduly narrow and hence the appeals process itself violates the federal law calling for its implementation. This contention cannot be sustained. By limiting the available issues for review, defendants are simply following the guidelines of the federal agency responsible for the administration of the Medicaid Act. Moreover, Wisconsin law accommodates plaintiff's challenges. It provides for state court review of administrative decisions, Wis.Stat. § 227.52; demands that a full record of the administrative hearing be transmitted to the reviewing state court, Wis.Stat. § 227.55; and allows the reviewing state court to reverse any agency decision "in violation of a constitutional or statutory provision," Wis. Stat. § 227.57(8).

Therefore, in light of the predominantly local factors under consideration and the existence of adequate state court review of the administrative hearings, I will abstain from disturbing the state administrative proceedings.

**2.** The Health Care Financing Administration has written that "states are free to establish *reasonable* criteria for appeals to limit the issues on appeal that may be appropriate or to adopt other procedures to prevent frivolous appeals." 48 Fed.Reg. 56052 (Dec. 19, 1983).

## ORDER

Deferral to the state administrative proceedings under *Burford* requires dismissal of the complaint rather than a stay of the federal action pending a determination by the state courts. Therefore, IT IS ORDERED that defendants' motion to dismiss plaintiff's complaint is GRANTED.

## ON MOTION FOR RECONSIDERATION

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, plaintiff has moved for reconsideration of a judgment entered on October 25, 1989 granting defendants' motion to dismiss. Plaintiff also requests an oral argument on its motion. Upon reconsideration, I conclude that the October 25, 1989 judgment is sound, and thus I will deny plaintiff's motion to vacate this judgment.

For the purpose of deciding plaintiff's motion for reconsideration, I find the following facts. The Medicaid Act distributes federal funding to participating states for the purpose of providing medical services to certain categories of needy people. States wishing to participate in the program must develop a state plan which meets certain minimum qualifications found at 42 U.S.C. § 1396a(a). One of these is that the reimbursement rates for services rendered by provider hospitals be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ..." 42 U.S.C. § 1396a(a)(13)(A). Another is that the state agency in charge of administering the state's Medicaid program must establish an appeals mechanism that allows providers to submit additional evidence and receive prompt administrative review on reimbursement issues which the agency considers relevant. 42 C.F.R. § 447.253(c).

Wisconsin has elected to participate in the Medicaid program and defendants are state officials responsible for the administration of the program. Plaintiff is a nonprofit, Wisconsin hospital that provides services to Medicaid recipients. Effective July 1, 1987, defendants amended Wisconsin's state plan in order to implement a new method of reimbursing provider hospitals.

The amended plan provides that hospitals will be reimbursed at a fixed rate for each Medicaid recipient they treat. This fixed rate is calculated for each provider by determining the hospital's allowable costs associated with treating Medicaid patients in a base year, and then dividing this allowable-costs figure by the total number of Medicaid recipients discharged from the hospital in the base year.

The base year used to calculate St. Michael Hospital's rate per discharge was July 1, 1985 through June 30, 1986 (1986 fiscal year). During this year, defendants maintained a "gatekeeper program" for Medicaid recipients who required mental health services or alcohol and other drug abuse treatment services. One of the objectives of the gatekeeper program was to utilize public facilities such as the Milwaukee County Mental Health Complex as much as possible.

St. Michael Hospital is located in Milwaukee County. During St. Michael Hospital's base year, almost all Milwaukee County Medicaid recipients with a nonemergency psychiatric diagnosis, ages 22 through 64 inclusive, were admitted to the Milwaukee County Mental Health Complex as a result of the gatekeeper program. As of July 1, 1986 (the first day following the end of St. Michael Hospital's base year), defendants eliminated the gatekeeper program, which meant that St. Michael Hospital had to render services to a greater number of patients requiring mental health or alcohol and other drug abuse treatment.

This elimination of the gatekeeper program intersected with what is known as the "HMO initiative," a program implemented on January 1, 1985, in which defendants required most Milwaukee County Medicaid recipients to enroll in a health maintenance organization.

Health Maintenance Organizations received Medicaid reimbursement from defendants and, in turn, arranged through contract to have services rendered to their enrollees by health care providers. After January 1, 1985, health care providers, including St. Michael Hospital, received reimbursement for rendering services to

Medicaid recipients enrolled in a Health Maintenance Organization through Health Maintenance Organization contracts and received no money directly from the State of Wisconsin for services rendered to these patients.

Certain categories of patients were exempted from the Health Maintenance Organization initiative: in particular, those individuals with more than two inpatient hospital stays of 16 days or longer for mental health or alcohol and other drug abuse treatments. As a result of the elimination of the gatekeeper program and implementation of the Health Maintenance Organization initiative, beginning in the year after St. Michael Hospital's base year, the percentage of Medicaid patients whose services were paid for directly by the State of Wisconsin increased to approximately 33% of all such patients, causing St. Michael Hospital's case mix for fiscal years 1987 and beyond to differ markedly from the case mix for its base year of fiscal 1986.

Wisconsin's state plan provides for challenges to a hospital's prospective reimbursement rate on account of case mix changes, but limits these challenges to changes arising out of "the implementation or cessation, after the base year, of the Medical Assistance Preferred Enrollment/HMO initiative." Prior to filing its original action in this court, plaintiff notified defendants that plaintiff's reimbursement rate did not adequately reflect the case mix that it was presently handling. In a letter dated April 11, 1989, defendants denied plaintiff's request for an adjustment, stating:

> The prospective rate [based on plaintiff's 1986 fiscal year] established January 26, 1989 for the period starting July 1, 1987 and ending June 30, 1988 is not subject to an administrative adjustment for a new service or a case-mix adjustment due to the HMO initiative. The hospital's request for such an adjustment must be denied because they do not meet the criteria for an administrative adjustment under the provisions of the State Plan in effect for that time period.

At the time of the filing of plaintiff's motion for reconsideration, plaintiff has two reimbursement appeals pending before the Wisconsin Department of Health and Social Services' Office of Administrative Hearings (appeals board), although the particular reimbursement issues which these appeals concern have not been disclosed. At times, decisions by the appeals board are delayed, sometimes for more than two years.

The Office of Administrative Hearings of the Wisconsin Department of Health and Social Services does not segregate Medicaid reimbursement cases from other administrative cases. The same office that is charged with administratively adjudicating Medicaid reimbursement challenges also adjudicates individual eligibility determinations for medical assistance, foodstamp entitlements, entitlement to Aid to Families with Dependent Children, entitlement to Low–Income Energy Assistance, and entitlement to aid under the Relief of Needy Indian Persons Program. Medicaid reimbursement challenges may be heard by any of the various hearing examiners employed by the Department of Health and Social Services' Office of Administrative Hearings.

## OPINION

Plaintiff contends that the defendants are using a base-year cost reimbursement formula that does not recognize the costs which plaintiff actually incurs in treating Medicaid recipients. In my order of October 25, 1989, I invoked the *Burford* doctrine to abstain from deciding whether defendants had complied with the Medicaid Act's demand that states provide reimbursement rates that are "reasonable and adequate" to meet the costs of "efficiently and economically operated facilities" on the ground that the state administrative appeals board was better suited to hear this cost-specific challenge to plaintiff's reimbursement rate. Plaintiff challenges this interpretation of the *Burford* doctrine on three grounds: (1) the defendants have not consolidated the administrative and judicial review of Medicaid reimbursement challenges in a centralized system; (2) plain-

tiff's case involves the interpretation of federal law, not state law; and (3) abstention deprives plaintiff of any federal relief from defendants' alleged violation of the Medicaid Act. I will address these contentions separately.

### A. Centralized Administrative and Judicial Review

Plaintiff is correct in pointing out that in *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and in cases analyzing *Burford, see e.g., Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *New Orleans Public Service, Inc. v. New Orleans*, —— U.S. ——, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), courts have considered it important whether a unified state regulatory process existed, consisting of a specialized state agency and the right of appeal to a particular state court.

In *Burford*, the Supreme Court held that federal court abstention was appropriate in a suit challenging a Texas Railroad Commission's decision to grant an oil drilling permit to petitioner. In making its decision, the Court emphasized the facts that Texas's oil and gas regulations were complex, that the regulatory scheme involved matters of state law, that state court review of commission decisions was "expeditious and adequate," and that the Railroad Commission and the reviewing state court worked in conjunction with each other to formulate a coherent state policy.

> Concentration of judicial supervision of Railroad Commission orders permits the state courts, like the Railroad Commission itself, to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in the field.

*Burford*, 319 U.S. at 327, 63 S.Ct. at 1104.

Plaintiff contends that the factors that guided the *Burford* decision are absent from Wisconsin's Medicaid program: it is not an exclusive product of state law, administrative review of reimbursement challenges can be protracted, judicial review of administrative decisions is not concentrated in one court, and there is no effort to create an administrative or judicial body with specialized knowledge of the Medicaid system.

Although plaintiff's contentions have merit, I believe plaintiff underestimates the emphasis of the current Medicaid Act to shift ratemaking and supervisory authority to the states. In 1981, Congress amended the hospital reimbursement provisions of the Medicaid Act pursuant to the Boren Amendment in order to give the states more freedom and flexibility in setting the rates for provider hospitals. The purpose of the Boren Amendment was to reduce some of the expenses of the Medicaid system by allowing states to set their own reimbursement rates without burdensome federal oversight of their methods and by permitting states to develop payment systems that would promote efficiency through cost-reduction incentive policies. *Colorado Health Care v. Colorado Dep't of Social Services*, 842 F.2d 1158, 1165 (10th Cir.1988).

Pursuant to this amendment, the Health Care Finance Administration of the federal Department of Health and Human Services enacted regulations implementing this conferral of authority on the states. One such regulation requires each participating state to provide an appeals board for hearing challenges to reimbursement rates by provider hospitals "with respect to such issues as the agency determines appropriate." 42 C.F.R. § 447.253(c).

After the regulations were enacted, the Health Care Finance Administration received suggestions that it establish minimum criteria setting forth the factors that would constitute an "appropriate issue" for a state's appeals board to hear a rate challenge. The Health Care Finance Administration refused to do so on the grounds that the states should be given the flexibility "to determine the administrative process that would ... be most compatible with their reimbursement system." 48 Fed.Reg. 56052 (December 19, 1983).

This bestowal of administrative authority on the states to establish and coordinate their own reimbursement policies argues

for abstention under *Burford*. In *New Orleans Public Service*, 109 S.Ct. 2506, the Supreme Court recognized the importance of federal court abstention under *Burford* in situations in which the state was attempting to establish a coherent policy.

> Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies ... where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service*, 109 S.Ct. at 2514, quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

In *New Orleans Public Service*, the Court held that *Burford* abstention did not apply to a utility's claim that a local rate-making body's decision not to grant the utility a rate increase was preempted by a decision of the Federal Energy Regulatory Commission. According to the Court, abstention was not mandated in this situation because the utility's claim did not involve local factors or implicate state policy; rather, it simply raised the question whether the Council's actions were pre-empted by federal law. "[N]o inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is *facially preempted* by FERC's allocative decree and relevant provisions of the Federal Power Act." *Id.* 109 S.Ct. at 2515 (emphasis added).

Conversely, plaintiff's case requires an inquiry into the factors that were considered in determining plaintiff's reimbursement rate. A facial analysis of the rate will not indicate whether it meets the "reasonable and adequate" standard of § 1396a(a)(13)(A). Rather, only an examination of defendants' use of industry- and cost-specific factors will yield a determination whether plaintiff's rate is proper. In a case on which plaintiff places much weight, *Bath Memorial Hospital v. Maine Health Care Finance Commission*, 853 F.2d 1007 (1st Cir.1988), the Court of Appeals for the First Circuit recognized this distinction between facial review and fact-specific analysis in deciding an abstention question: "The plaintiffs do not seek individualized review of fact- (or cost-) specific regulatory decisionmaking. To the contrary, they attack the statute as it is written ... Review here would not threaten to create in the federal court a parallel review institution." *Id.* at 1015.

■ Plaintiff is attacking the defendants' use of allegedly insufficient data in calculating its reimbursement rate. If this court were to hear this challenge, it would become a "parallel review institution," because the state appeals board has been slated by the regulations to hear challenges of this nature. Moreover, I do not believe that the board's decision not to hear plaintiff's challenge alters the substance of plaintiff's complaint; the appeals board is simply following the guidelines of the federal regulations telling it to limit the issues it will hear to those it considers relevant.

Also, I do not believe that the lack of concentration of administrative review among certain officers and judicial review in a particular court should change the decision. In *Burford* and *Alabama Public Service*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002, the Supreme Court looked to this factor of consolidated administrative and judicial review to determine whether the state was trying to establish a coherent policy. Here, there is no issue whether Wisconsin is endeavoring to establish a coherent Medicaid policy: the Medicaid Act imposes on participating states the responsibility to produce a coherent ratemaking policy. Furthermore, the Act's regulations call for the state to create an apparatus for hearing rate challenges because of the view that the state is better suited to make decisions that conform to its policy determinations. In addition, although it is unfortunate that administrative decisions are subject to delays, this does not reflect the efficiency of *judicial* review of the agency decision, which was the concern in *Burford* and *Alabama Public Service*. Therefore, I conclude that the Medicaid Act's emphasis

on state administration and the fact-specific nature of plaintiff's claim warrant abstention under the *Burford* doctrine.

### B. Federal Law, Not State Law, Is At Issue

Plaintiff contends that unlike the situations in *Burford* and *Alabama Public Service,* the question at issue in this case involves the application and interpretation of federal law, not state law. Plaintiff argues that by not providing it with a sufficient reimbursement rate, defendants are breaching the provision in the Medicaid Act requiring states to set rates that are "reasonable and adequate." 42 U.S.C. § 1396a(a)(13)(A).

■ Plaintiff is correct in that both *Burford* and *Alabama Public Service* involved state agency interpretation of state law and that this case involves a state agency's interpretation of federal law. However, plaintiff disregards the fact that the Medicaid Act directs the states to decide what are reasonable and adequate rates. In a suit by a provider hospital challenging the methods used by Virginia to determine the state's rate formulas, the District Court for the Eastern District of Virginia noted this intent to vest the states with ratemaking authority:

> It would be inappropriate for the Court to determine what cost-influencing factors are significant enough that Virginia should have incorporated them into its rate-setting formula. This is the task Congress specifically left to the states when it said that rates should be "determined in accordance with methods and standards developed by the State ..." 42 U.S.C. § 1396a(a)(13)(A).

*Mary Washington Hospital, Inc. v. Fisher,* 635 F.Supp. 891, 899 (E.D.Va.1985). I agree that the determination whether a rate is proper under the Medicaid Act is the province of the participating state. Therefore, I conclude that abstention under *Burford* is not obviated by the fact that the state regulatory agency is acting pursuant to the demands of a federal statute.

### C. Denial of Federal Court Relief

Plaintiff contends that abstention in this case will deprive it of any federal court relief from defendants' allegedly ongoing violation of the Medicaid Act. Plaintiff relies principally on *Virginia Hospital Association v. Baliles,* 868 F.2d 653 (4th Cir. 1989), for the proposition that *Burford* abstention is not appropriate when a provider hospital challenges the reimbursement procedures of a state's Medicaid plan.

In *Virginia Hospital Association,* the Court of Appeals for the Fourth Circuit held that *Burford* abstention did not apply to an action brought by a group of hospitals challenging the procedures used in Virginia's reimbursement plan. However, one of the primary reasons that the court found abstention inappropriate was that the plaintiff class was challenging the methodology by which the rate-setting procedures were promulgated, not the adequacy of individual rates. "Because [plaintiff class] challenged the system and not individual providers' reimbursement rates, the [district] Court found inapposite [defendant's] contention that providers should first have to appeal through the plan's administrative apparatus." *Id.* at 664.

Here, plaintiff's claim is individual, not systemic. Although plaintiff complains about the procedures used to calculate its rate, the focus of plaintiff's claim is on the inability of the base-year data to reflect plaintiff's current case mix, not on the equations established to coordinate the data. This characterization of plaintiff's claim as individual is bolstered by the fact that plaintiff first submitted its claim to the appeals board, which is designed to hear individual complaints about inadequacies in particular reimbursement rates. Therefore, I conclude that in light of the particularity of plaintiff's claim, the appeals board is better suited than this court to hear the complaint, and thus abstention under the *Burford* doctrine is warranted.

### ORDER

IT IS ORDERED that plaintiff's motion for reconsideration and its request for oral argument on this motion are DENIED.